ABELE, J.
{¶ 1} This is a consolidated appeal from a Highland County Common Pleas Court, Juvenile Division, judgment that granted Highland County Children Services (HCCS), appellee herein, permanent custody of thirteen-year-old K.W. This matter has a long and tortured history for everyone involved in this case, but especially for the minor child. D.W., the child's biological father, raises the following assignments of error:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AS THE COURT ABUSED ITS DISCRETION BASED ON THE TOTALITY OF THE CIRCUMSTANCES IN SUSPENDING THE VISITATION OF FATHER, THAT THE AGENCY DID NOT MAKE REASONABLE EFFORTS IN REGARDS TO FATHER, AND THE AGENCY FAILED TO PROVE BY CLEAR AND CONVINCING EVIDENCE THAT K.W. COULD NOT BE REUNIFIED WITH FATHER IN A REASONABLE TIME WITH THE COURT USING EVIDENCE OUTSIDE THOSE FACTS WHICH LEAD UP TO THE ORIGINAL FINDING OF DEPENDENCY IN THIS CASE."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN DENYING THE FATHER'S MOTION FOR K.W. TO UNDERGO A NEW PSYCHOLOGICAL AS HE HAS A RIGHT TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION AND THE OHIO CONSTITUTION IS VIOLATED DURING A PERMANENT CUSTODY HEARING WHEN HE IS DENIED ACCESS TO
*377 FUNDAMENTALLY FAIR PROCEEDINGS, OF WHICH, THE AVAILABILITY OF EXPERT ASSISTANCE MAY BE ONE WHEN MENTAL HEALTH IS AN ISSUE."
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN RELYING ON STALE AND CONFLICTING PSYCHOLOGICAL EVALUATION AND MENTAL HEALTH ASSESSMENTS TO DETERMINE FATHER'S MENTAL HEALTH DIAGNOSIS AS WELL AS CITING AN INCORRECT DIAGNOSIS FROM THE PSYCHOLOGIST IN THE COURT'S DECISION AND THEN USING THE INCORRECT DIAGNOSIS TO JUSTIFY THE DECISION FOR PERMANENT CUSTODY."
FOURTH ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN DENYING FATHER'S MOTION TO EXCLUDE THE GUARDIAN AD LITEM'S REPORT FROM TESTIMONY AS THE GUARDIAN AD LITEM FAILED TO MEET THE DE MINIMIS REQUIREMENTS OF SUPERINTENDENCE RULE 48."
{¶ 2} Also, the child's paternal grandparents, P.W. and C.W., raise the following assignments of error:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT ABUSED ITS DISCRETION PROCEDURALLY DURING THE PERMANENT CUSTODY HEARINGS, CONSTITUTING PREJUDICIAL ERROR."
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED IN FINDING THAT THE AGENCY HAD MADE REASONABLE EFFORTS TO REUNIFY THE CHILD WITH HER PARENTS AND/OR GRANDPARENTS."
{¶ 3} K.W. has been the subject of a custody dispute since 2010, when the child's mother left the child with the parental grandparents. Father later filed a complaint and requested the child's legal custody. The trial court ultimately found the mother and the father to be unsuitable, and placed K.W. in the paternal grandparents' legal custody.[1]
{¶ 4} The trial court found the mother unsuitable for the following reasons: (1) she relinquished custody; (2) she has not seen or contacted the child since December 24, 2010; (3) she is homeless; and (4) she is incapable of caring for the child. The court also found that the father is unsuitable and that it would be harmful/detrimental to place child in father's custody based upon the following circumstances: (1) "[b]oth parents exert an unhealthy level of control over the child which confuses the child to the extent she is fearful to exhibit any care or love for one parent in the presence of the other"; (2) "[t]he child is concerned over physical violence while in the home of her father"; (3) "[b]oth parents use Parental Alienation techniques by isolating the child from social contacts which have led to academic delays and lack of adequate medical care"; (4) the father displays a "pattern of controlling women" and an "aggressive/assertive nature"; (5) "[t]he father has isolated the child and controlled her to an extent it was detrimental to the child"; (6) the mother testified that the father "beat [her] about a dozen times" and has "threatened to kill" her if she reported him; (7) during her in camera interview, the child stated that "her father had been violent with her and that she wanted to remain with her grandparents"; (8) the father is physically abusive; and (9) the child reported seeing the father abuse the mother.
*378 {¶ 5} The trial court awarded both mother and father supervised parenting time to be held at the Family Advocacy Center (FAC). The mother occasionally visited the child. The father had some visits with the child, but the grandparents refused to bring the child to visits for over one year. This situation persisted until 2014, when appellee filed a dependency complaint.
{¶ 6} The dependency complaint alleged that the grandparents violated the court order regarding the mother's and the father's parenting time by permitting the mother to have contact with the child outside of the FAC and by refusing to allow the father to visit the child.
{¶ 7} On September 16, 2014, the trial court adjudicated the child dependent based upon the following facts: (1) the grandparents live in a camper without running water; (2) between August 2013 and June 2014, the grandparents refused to take the child to visit the father; (3) the grandparents have allowed the child to have contact with her mother outside of the FAC, in violation of a court order; and (4) the grandparents have denigrated the father in the child's presence in an effort to alienate her affections. The court subsequently placed the child in appellee's temporary custody.
{¶ 8} On January 12, 2016, appellee filed a motion to modify the disposition to permanent custody. Appellee asserted that the child has been in its temporary custody for at least twelve out of the last twenty-two consecutive months and that it is in the child's best interest to place her in appellee's permanent custody. Appellee alleged that although the father has attended most of his visits with the child, "his behavior and demeanor toward the child during some of the visits is cause for concern." Appellee further asserted that the child "is thriving in the [foster home] and bonded with the family and other children in the home."
{¶ 9} Due to unforeseen circumstances, the trial court continued the permanent custody hearing a few times. While the permanent custody motion remained in abeyance, father filed a motion to increase his visitation time. The court subsequently granted father's request and extended time from two hours to three hours. One month later, however, the court curtailed father's visits. The court found that testimony from the child's counselor, the guardian ad litem and children services "regarding supervision of the current visits indicated that the visits are very problematic and create trauma for the child. [The father] spends a good part of his parenting time correcting or disciplining the child to the point that the child would ask the agency to terminate the visit."
{¶ 10} Appellee later dismissed its permanent custody motion and filed a new dependency complaint that involved the child. The new complaint alleged that although father regularly visited the child, he has not had any visits outside of the FAC since April 2011. Appellee further asserted that family counseling is a case plan objective, but that it has not yet occurred. Appellee requested the court to grant it temporary custody of the child.
{¶ 11} On October 7, 2016, father admitted dependency and the trial court adjudicated the child dependent. The court (1) ordered the child to remain in appellee's (HCCS) temporary custody pending further hearings, and (2) found that appellee used reasonable efforts by providing case management services.
{¶ 12} The case plan that appellee developed indicated that the father "has been involved in several criminal cases regarding drugs and domestic violence. The relationship between [the father] and his *379 parents, [the paternal grandparents], is basically non-existent. [The child] is constantly being put in the middle of [their] altercations, which is making her very confused as to what to do or say to both parties." The case plan stated that the father "will no longer use illegal substances" and "will learn how to cope/respond to unexpected stressors." The case plan required him to submit to random drug screens, sign necessary releases, inform appellee of any address or phone number changes, make himself available for monthly, face-to-face contact with appellee, call his caseworker to inquire about all appointments for the child, and "begin/complete counseling services as recommended by Bobbie Hopes." The case plan also stated that the "[c]aseworker will make a referral for services at an agency-approved provider."
{¶ 13} On November 1, 2016, mother and the grandparents admitted dependency. The trial court again adjudicated the child dependent. The parties agreed to continue the child in appellee's temporary custody for six months. Additionally, the court (1) allowed mother to have supervised visits at the FAC, (2) did not allow the grandparents to have visitation without appellee's and the GAL's approval, and (3) allowed the father to have visits with the child at the FAC that graduated to supervised visits outside of the FAC and eventually unsupervised visits outside of the FAC, subject to various conditions.[2] The court further found that appellee used reasonable efforts.
{¶ 14} On January 25, 2017, the GAL filed a motion to suspend father's and grandparents' visitations. She alleged that the child has expressed suicidal ideation as a result of the family counseling currently occurring between the child and father. The GAL indicated that "the child's counselor believes that continued counseling with father would be detrimental to the child." The GAL further asserted that the "[f]ather is not responding well to the child's viewpoint and later uses his visitation time to criticize and belittle her regarding issues she has brought up during counseling session." She additionally claimed that "[t]he father has exhibited unacceptable behavior at his supervised visits at the Family Advocacy Center both toward the child and toward staff members of the Advocacy Center." The GAL asserted that the grandparents "have attempted *380 to discuss issues with the child which are not to be discussed with her."
{¶ 15} Father opposed the GAL's motion and requested that the court not suspend his visits, but instead, allow him to have supervised visit with the child. He argued that suspending his visits would hinder case plan progress and prevent reunification. He further claimed that the child's counselor is biased against him.
{¶ 16} Father also filed a motion to request the court to order the child to undergo a new psychological evaluation or assessment. He noted that her last evaluation occurred over two years earlier.
{¶ 17} On January 30, 2017, the trial court suspended father's and grandparents' visitations.
{¶ 18} Appellee subsequently filed a motion to modify the disposition to permanent custody and asserted that (1) the child has been in its temporary custody for more than twelve out of the past twenty-two months, and (2) placing the child in appellee's permanent custody is in her best interest. Appellee claimed that the father did not consistently visit the child throughout November and December 2016, and that his visits were suspended as of January 30, 2017. Appellee alleged that family counseling did not benefit the father and the child's interaction and interrelationship and, in fact, the counselors terminated family counseling due to the child's increased anxiety and expressions of self-harm if she would be required to continue to see her father.
{¶ 19} The trial court interviewed the child twice and heard from more than twenty witnesses over eight days of testimony. Additionally, the parties submitted more than forty exhibits and the depositions of two other witnesses for the court to review.
{¶ 20} A brief summary of the evidence reveals that appellee presented evidence and testimony that tended to show that, although the father and the child shared many positive visits within the confines of the FAC, the father and the child have had a strained relationship.[3] The child has real or planted memories of her father physically harming her mother. Some of the testimony suggests that the child's grandparents may have planted negative memories of her father. Regardless, the child believed the memories to be true, and father failed to validate her feelings-whether the memories were true or not. Father's failure to validate the child's feelings appears to be the root cause of the parties' strained relationship as the child grew into adolescence. As the child matured, she expressed an unwavering fear of her father and extreme anxiety over the thought that the court might place her in his custody.
{¶ 21} Until November 2016, father hardly missed a visit with the child. However, beginning in mid to late November 2016 father missed five visits with the child. Father offered varying reasons for missing the visits, claiming that he either "forgot" or that he forgot to confirm the visits twenty-four hours in advance, as he had been doing for the previous two and one-half years when the child was in appellee's temporary custody. Appellee, however, presented evidence that father consciously chose not to visit the child. FAC staff stated that father was upset that his parents were allowed to visit the child immediately before his visit and that father informed FAC staff that he was *381 afraid of his parents. Father denied, however, that he did not visit due to fear of his parents.
{¶ 22} In November 2016, child and father started family counseling. Throughout six sessions, father was unable or unwilling to demonstrate adequate techniques of relating to his now thirteen-year-old daughter, who had not lived with him since she was approximately six years of age. Instead, father (1) dominated the sessions and would not allow the child to express her feelings of hurt and her wishes for the future, and (2) displayed rigidity and would not yield. The child's counselor believed that the sessions were truly harmful to the child and a source of her recent suicidal ideations. Because the counselor believed the family counseling sessions harmed the child, she recommended the sessions be suspended. Father's counselor likewise believed that the family counseling sessions did not improve the father-child relationship.
{¶ 23} After considering all of the evidence and testimony, the trial court awarded appellee permanent custody of the child. The court found that the child had been in appellee's temporary custody for more than twelve months out of a consecutive twenty-two-month period and that placing the child in appellee's permanent custody is in her best interest. The court found that the child and father did not share an overly positive relationship, but instead, father displayed controlling and unyielding behavior towards the child. On the other hand, the child has thrived while in the foster home. Her academic performance has improved, her demeanor has improved, and her emotional needs are being met. The court further noted that the child consistently expressed a desire to be placed in appellee's permanent custody so that the foster family could adopt her and did not indicate any desire to live with her father. Consequently, the court placed the child in appellee's permanent custody. These appeals followed.
I
{¶ 24} In his first assignment of error, father asserts, in essence, that the trial court's permanent custody decision is against the manifest weight of the evidence. More particularly, father challenges (1) the court's decision to suspend his visits with the child, (2) the court's finding that the agency used reasonable efforts, and (3) the court's finding that the child cannot be placed with the father within a reasonable time or should not be placed with him.
A
{¶ 25} Initially, we note that a reviewing court ordinarily will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. E.g., In re B.E., 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, 2014 WL 3557277, ¶ 27 ; In re R.S., 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, 2013 WL 6710797, ¶ 29.
"Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' "
Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *382 State v. Thompkins, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1594 (6th Ed.1990).
{¶ 26} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' " Eastley at ¶ 20, quoting Tewarson v. Simon, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983) ; accord In re Pittman, 9th Dist. Summit No. 20894, 2002-Ohio-2208, 2002 WL 987852, ¶¶ 23-24.
{¶ 27} The question that we must resolve when reviewing a permanent custody decision under the manifest weight of the evidence standard is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." In re K.H., 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:
the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.
In re Estate of Haynes, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." State v. Schiebel, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990) ; accord In re Holcomb, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing Cross v. Ledford, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.") In re Adoption of Lay, 25 Ohio St.3d 41, 42-43, 495 N.E.2d 9 (1986). Cf. In re Adoption of Masa, 23 Ohio St.3d 163, 165, 492 N.E.2d 140 (1986) (stating that whether a fact has been "proven by clear and convincing evidence in a particular case is a determination for the [trial] court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence"). Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. In re R.M., 4th Dist, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 62 ; In re R.L., 2nd Dist. Greene Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, 2012 WL 6674527, ¶ 17, quoting In re A.U., 2nd Dist. Montgomery No. 22287, 2008-Ohio-187, 2008 WL 185494, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' "). Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving *383 the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting State v. Martin, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " Id. , quoting Martin , 20 Ohio App.3d at 175, 485 N.E.2d 717 ; accord State v. Lindsey, 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).
{¶ 28} Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. Eastley at ¶ 21. As the Eastley court explained:
"[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment must be made in favor of the judgment and the finding of facts. * * *
If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."
Id. , quoting Seasons Coal Co., Inc. v. Cleveland, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn.3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).
{¶ 29} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." Davis v. Flickinger, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997) ; accord In re Christian, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, 2004 WL 1367399, ¶ 7. As the Ohio Supreme Court long-ago explained:
In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important. The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record.
Trickey v. Trickey , 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).
{¶ 30} Furthermore, unlike an ordinary civil proceeding in which a jury has no contact with the parties before a trial, in a permanent custody case a trial court judge may have had significant contact with the parties before a permanent custody motion is even filed. In such a situation, it is not unreasonable to presume that the trial court judge had far more opportunities to evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a mere reading of the permanent custody hearing transcript.
B
{¶ 31} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within *384 a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.
{¶ 32} Thus, before a trial court may award a children services agency permanent custody, it must find that (1) one of the circumstances described in R.C. 2151.414(B)(1) applies, and (2) awarding the children services agency permanent custody would further the child's best interests.
{¶ 33} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interests will be served by granting a children services agency permanent custody. The listed factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.
{¶ 34} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." In re C.F., 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing In re Schaefer, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56 ; accord In re C.G., 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, 2008 WL 2906526, ¶ 28 ; In re N.W. , 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, 2008 WL 224356, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." C.F. at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. In re K.M.S. , 3rd Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, 2017 WL 168864, ¶ 24 ; In re A.C., 9th Dist. Summit No. 27328, 2014-Ohio-4918, 2014 WL 5690571, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." In re C.B.C. , 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 66, citing In re Adoption of Ridenour, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).
C
{¶ 35} In the case at bar, we initially note that absent from the father's brief is any discussion regarding the child's best interest and how the best-interest factors apply to this case. Moreover, father does not directly correlate the trial court's suspension of his visits to any of the best-interest *385 factors. Instead, father focuses upon how the court's decision to suspend his visits negatively affected his ability to reunify with the child. We nevertheless construe father's argument as asserting that suspending his visits with the child deprived him of the opportunity to strengthen his relationship with the child so that the best interest factors would tilt in favor of placing the child in his custody. Father also complains that the trial court incorrectly suspended his visits without holding a hearing and without hearing any evidence, beyond the GAL's motion. Father claims that the evidence presented at the permanent custody hearing failed to support the court's decision to suspend visits, but instead shows that the court based its decision upon "speculation and testimony from persons biased towards the father." Father continues: "With absolutely no testimony as to the source of the child's behavioral problems other than pure speculation on the part of the counselor, foster parent, and doctor, the court completely hindered father's ability to reunify."
{¶ 36} Appellee counters that the trial court's decision to terminate visits was not based upon speculation, but instead upon the child's expression of self-harm and suicide. Appellee alleges that father criticized and belittled the child during counseling sessions and exhibited unacceptable behavior during his supervised visits. Appellee additionally points out that the child's counselor stated that continued counseling with father would be detrimental to the child.
{¶ 37} The GAL likewise responds that the trial court did not terminate father's visits based solely upon speculation, but instead asserts that the court interviewed the child on March 8, 2017 to ascertain her wishes and desires concerning both visitation and permanent custody. Moreover, during a November 2016 family counseling session, the child told her father that she did not want to live with him and wants her foster parents to adopt her. Additionally, the child's counselor testified that the child displayed high levels of stress during family counseling, did not want to make eye contact with her father, and refused her father's hugs.
{¶ 38} Generally, we review a trial court decision regarding a parent's visitation rights in the context of an abuse, neglect, or dependency action for an abuse of discretion. In re C.J. , 4th Dist. Vinton No. 10CA681, 2011-Ohio-3366, 2011 WL 2650841, ¶ 11, citing In re Carpenter, Washington App. No. 01 CA26, 2002 WL 185569, at *3 ; In re Unger Children , 5th Dist. Coshocton No. 04 CA 6, 2005-Ohio-2414, 2005 WL 1163915, ¶ 81. " '[A]buse of discretion' [means] an 'unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken.' " State v. Kirkland, 140 Ohio St.3d 73, 15 N.E.3d 818, 2014-Ohio-1966, ¶ 67, quoting State v. Brady, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23. "A court abuses its discretion by taking action that lacks reason, justification, or conscience." In re D.S. , 152 Ohio St.3d 109, 2017-Ohio-8289, 93 N.E.3d 937. "An abuse of discretion includes a situation in which a trial court did not engage in a ' "sound reasoning process." ' " State v. Darmond, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34, quoting State v. Morris, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp., 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The abuse-of-discretion standard is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court. Darmond at ¶ 34.
*386 {¶ 39} Case plans should ordinarily include " 'regular and frequent visitation and communication or other contact between the parents and child * * *.' " In re Jones , 29 Ohio App.3d 176, 180, 504 N.E.2d 719 (8th Dist.1985), quoting former R.C. 2151.412(B)(1)(b)(I). However, "the child's health and safety shall be the paramount concern." R.C. 2151.412(H).
{¶ 40} A court that is reviewing visitation issues in an abuse, neglect, or dependency case should consider "the totality of circumstances as they relate to the child's best interest." C.J. at ¶ 15 ; In re Knisley, 4th Dist. No. 97CA2316, 1998 WL 372703 (May 26, 1998), *6 (explaining that in dependency proceedings, "the juvenile court should consider the issue of visitation under the totality of the circumstances, considering, to the extent they are applicable, those [best interest] factors set forth in R.C. 3109.051(D)"); accord In re J.S. , 11th Dist. Lake No. 2011-L-162, 2012-Ohio-4461, 2012 WL 4481311, ¶ 30 ; In re C.H., 10th Dist. No. 10AP-579, 2011-Ohio-1386, 2011 WL 1049511, ¶ 12 ; In re C.C., 2nd Dist. No. 21707, 2007-Ohio-3696, 2007 WL 2069497, ¶ 8. "Until permanent custody is granted by the court, visitations should not be prematurely curtailed, unless it can be shown that the child will truly be harmed by the visitations." In re Jeffrey S. , 6th Dist. Lucas No. L-96-178, 1998 WL 879652, *12. Thus, a court ordinarily should deny visitation only in "exceptional cases." Jones , 29 Ohio App.3d at 180, 504 N.E.2d 719.
{¶ 41} In Jones , for example, the court concluded that the trial court properly exercised its discretion by denying visitation when the court based its decision upon the child's wishes, as well as the testimony of therapists and psychologists. In Jones , the child's mental health professionals "concluded that forced visitation with [the parent] would be deleterious to [the child]'s mental and emotional health." Id. at 180, 504 N.E.2d 719.
{¶ 42} In Unger , the court concluded that the evidence established that the child's visits with the parent caused "trauma." Additionally, the child explained reasons why he did not wish to visit the parent. Moreover, both the child's counselor and the guardian ad litem recommended against visitation.
{¶ 43} On the other hand, in Jeffrey S. the court determined that the trial court abused its discretion by preventing visits between the children and their parents. In Jeffrey S. , the guardian ad litem filed a motion to terminate visits based upon an allegation that the mother advised "the children not to speak to anyone, including therapists, regarding abuse issues." The evidence showed, however, that the visits occurred under "close supervision" and were "positive." Id. at *12. Additionally, "the children looked forward to the visits with all the parents" and "were reluctant to leave the visits." Id. at *13. The court determined that the guardian ad litem's concerns "were thus too speculative to warrant a continuing no contact order." Id.
{¶ 44} In the case at bar, we do not believe that the trial court abused its discretion by suspending visits between father and child. The guardian ad litem asserted that the child was expressing thoughts of suicide due to her fear of being placed in her father's custody. At the permanent custody hearing, the GAL testified that the child's counselor had called the GAL, and the counselor "was very concerned." The GAL indicated that she believed that she "needed to do something." The GAL stated that she spoke with the child, and she thought that her "only option at that point in time was to ask the court to suspend any visitation before any harm could come to [the child]." The GAL additionally stated that although the child *387 initially was willing to visit with her father at the FAC, "she no longer wants to have any contact with him."
{¶ 45} The child's counselor opined that father was "emotionally abusive" to the child because he "wouldn't acknowledge [the child's] thoughts or her feelings," "he wanted to dominate," and "he wanted to tell his story, but he wasn't willing to listen to hers." The child's pediatrician believed that the entire reunification process had been traumatic for the child.
{¶ 46} The trial court interviewed the child twice-in November 2016 and March 2017-and each time the child consistently stated that she did not want to live with her father, but instead she wanted to be adopted "real quick." During the March 2017 interview, the child related her fear of her father and her concerns about being placed in his custody.
{¶ 47} The trial court briefly addressed the father's motion to reinstate his visits following the March 20, 2017 permanent custody hearing, and the guardian ad litem indicated that the child "does not wish to visit." The GAL additionally stated that she does not believe that visits with father are in the child's best interest.
{¶ 48} The trial court found that, in light of the child's "delicate emotional situation," visits with father would not be prudent. The court expressed its "fear that she could * * * possibly * * * and I'm using this term very speculatively * * * do harm to herself. And I'm not going to have that risk on my conscience."
{¶ 49} In light of all of the foregoing circumstances, we are unable to conclude that the trial court acted unreasonably, arbitrarily, or unconscionably by suspending father's visits. Instead, the court could have reasonably concluded that the visits caused the child emotional harm and, thus, were not in her best interest.
{¶ 50} To the extent that appellant contends that the trial court erred by failing to hold an evidentiary hearing before the court granted the motion to terminate the visits, we observe that father did not file a timely request for a hearing. R.C. 2151.412(F)(2) specifies the procedure that applies when any party "propose[s] a change to a substantive part of the case plan, including, but not limited to, the child's placement and the visitation rights of any party." The statute states:
* * * * A party proposing a change to the case plan shall file the proposed change with the court and give notice of the proposed change in writing before the end of the day after the day of filing it to all parties and the child's guardian ad litem. All parties and the guardian ad litem shall have seven days from the date the notice is sent to object to and request a hearing on the proposed change.
The statute thus contemplates that a party who opposes a proposed change must request a hearing in order to be entitled to one. Otherwise, "the court may approve the proposed change without a hearing." R.C. 2151.412(F)(2)(b).
{¶ 51} In the case at bar, father did not request the court to hold a hearing within seven days from the date the GAL filed her motion to suspend visitations. Consequently, the statute did not require the trial court to hold a hearing.
{¶ 52} While we also recognize that suspending father's visits impacted his relationship with the child, the suspension of the visits occurred at the end of a very long road. The child already had been in appellee's temporary custody for more than two and one-half years, and, during that time frame, father had more than ample opportunities to establish a healthy parent-child bond. However, father did not *388 progress to the point that he could exercise unsupervised visits with the child. We thus believe that father's conduct, and the reactions to his conduct, caused the missed opportunities to develop a healthy parent-child bond.
{¶ 53} Accordingly, we disagree with father that the trial court abused its discretion by suspending his visits or that the suspension of his visits contributed to the trial court's finding that placing the child in appellee's permanent custody is in her best interest.
D
{¶ 54} Father next asserts that appellee failed to use reasonable efforts to reunify the family. He claims that he completed his case plan and "used every resource available to him to address his mental health, to improve his parenting skills, to improve his overall functioning and ability to parent [the child], to have adequate housing for her and to have financial stability to provide for [the child]." The father additionally points out that he attended the vast majority of his visits with the child and that he engaged in family counseling sessions in an attempt to deepen his relationship with his daughter. Father contends that despite all of his efforts, appellee did not use reasonable efforts. He faults the caseworker for failing to hold case review meetings or semiannual administrative reviews (SARs). He also claims that appellee should have subjected the child to further psychological evaluation after she expressed thoughts of suicide and that appellee should have instituted family counseling much sooner than November 2016.
{¶ 55} Appellee responds that the trial court made several reasonable-efforts findings in the prior case and also made a reasonable-efforts finding on November 1, 2016. Appellee further points out that contact with the father became difficult once the father informed his caseworker and the GAL not to contact him anymore, but rather, to contact his attorney. Appellee claims that the father "created his own hurdles which made it difficult for the Agency to provide services."
{¶ 56} R.C. 2151.419(A)(1) requires a trial court to determine whether a children services agency "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." However, this statute applies only at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *." C.F., supra , at ¶ 41 ; accord In re C.B.C. , 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 72. Thus, " '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.' " C.F. at ¶ 41, quoting In re A.C. , 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, 2004 WL 2340127, ¶ 30. Nonetheless, "[t]his does not mean that the agency is relieved of the duty to make reasonable efforts" before seeking permanent custody. Id. at ¶ 42. Instead, at prior "stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." Id. Additionally, "[if] the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." Id. at ¶ 43.
*389 {¶ 57} We discussed the meaning of "reasonable efforts" in C.B.C. , supra , at ¶ 76, as follows:
In general, "reasonable efforts" mean " '[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed.' " C.F. at ¶ 28, quoting Will L. Crossley, Defining Reasonable Efforts: Demystifying the State's Burden Under Federal Child Protection Legislation, 12 B.U.Pub.Int.L.J. 259, 260 (2003). " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " In re H.M.K., 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317 [2013 WL 5447791], ¶ 95, quoting In re D.A., 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104 [2012 WL 929609], ¶ 30. In other words, the agency must use reasonable efforts to help remove the obstacles preventing family reunification. Bean, Reasonable Efforts: What State Courts Think, 36 U. Tol. L.Rev. 321, 366 (2005), quoting In re Child of E.V., 634 N.W.2d 443, 447 (Minn.Ct.App.2001), and In re K.L.P., No. C1-99-1235, 2000 WL 343203, at *5 (Minn.Ct.App. Apr. 4, 2000) (explaining that the agency must address what is "necessary to correct the conditions that led to the out-of-home placement" and must "provide those services that would assist in alleviating the conditions leading to the determination of dependency"). However, " '[r]easonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." In re Lewis, 4th Dist. Athens No. 03CA12, 2003-Ohio-5262 [2003 WL 22267129], ¶ 16. Furthermore, the meaning of "reasonable efforts" "will obviously vary with the circumstances of each individual case." Suter v. Artist M., 503 U.S. 347, 360, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). Additionally, "[i]n determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).
{¶ 58} In the case at bar, after our review of the record we believe that the record shows that appellee used reasonable efforts. Appellee provided extensive case management services over the course of more than two years. Appellee offered referrals and supervised visitations. Wheaton testified as to the amount of time and energy she spent on this case, and indicated that she spent more time on this case than any other case in her career.
{¶ 59} While appellee may not have implemented family counseling as quickly as the father would have preferred, appellee cited a valid reason for the delay-the child's counselor did not believe that the child was ready to engage in family counseling. Indeed, the main point of appellee's decision to dismiss its first permanent custody motion and to file a new case was to allow father and child to engage in family counseling. Father and the child engaged in six family counseling sessions, but the sessions did not help the father and the child establish a healthy relationship such that reunification could be a possibility. Instead, both the father's counselor and the child's counselor described the family counseling sessions as unsuccessful. The child's counselor believed the sessions emotionally harmed the child and did not believe that subjecting her to this continued emotional abuse would strengthen the parties' relationship sufficiently that reunification could be attempted. In sum, we have reviewed the record and find nothing *390 to suggest that appellee's efforts fell short of reasonable.
{¶ 60} Furthermore, even though father may have engaged in the services that appellee requested of him, case plan compliance is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency. In re W.C.J., 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, 2014 WL 7477958, ¶ 46 ("[s]ubstantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency."); see In re M.H. , 4th Dist. Pike No. 17CA882, 2017-Ohio-7365, 2017 WL 3701168, ¶ 102 ; In re S.S. , 4th Dist. Jackson No. 16CA7 and 16CA8, 2017-Ohio-2938, 2017 WL 2256777, ¶ 164 ; In re M.B. , 4th Dist. Highland No. 15CA19, 2016-Ohio-793, 2016 WL 818754, ¶ 59 ; In re N.L., 9th Dist. Summit No. 27784, 2015-Ohio-4165, 2015 WL 5834018, ¶ 35 (stating that substantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous"); In re S.C., 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, 2015 WL 3647939, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); In re West, 4th Dist. Athens No. 03CA20, 2003-Ohio-6299, 2003 WL 22769711, ¶ 19. Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, "it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights." In re Gomer, 3rd Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, 2004 WL 722978, ¶ 36 ; accord In re A.S., 8th Dist. Cuyahoga No. 100530 and 100531, 2014-Ohio-3035, 2014 WL 3400712, ¶ 32. Consequently, even if father complied with the case plan services, these actions do not necessarily demonstrate that placing the child in his custody would serve her best interest.
{¶ 61} Accordingly, based upon the foregoing reasons, we disagree with the father that the evidence shows that appellee failed to use reasonable efforts.
E
PLACEMENT WITH FATHER WITHIN A REASONABLE TIME
{¶ 62} The father next argues that the trial court erred by concluding that the child could not be placed with the father within a reasonable time.
{¶ 63} In the case sub judice, the trial court determined that R.C. 2151.414(B)(1)(d) applies. The father does not dispute that the child has been in appellee's temporary custody for twelve or more months of a consecutive twenty-two-month period within the meaning of R.C. 2151.414(B)(1)(d). If the court finds that R.C. 2151.414(B)(1)(d) applies, then it need not also find that the child cannot or should not be placed with either parent within a reasonable time. E.g., In re C.W., 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21 ; In re A.M.1, 4th Dist. Athens Nos. 10CA21 through 10CA31, 2010-Ohio-5837, 2010 WL 4890433, ¶ 31 ; In re T.F., 4th Dist. Pickaway No. 07CA34, 2008-Ohio-1238, 2008 WL 734957, ¶ 23 ; In re Williams, 10th Dist. Franklin No. 02AP-924, 2002-Ohio-7205, 2002 WL 31870153 ; accord In re J.F., 8th Dist. Cuyahoga No. 105504, 2018-Ohio-96, 2018 WL 386668, ¶ 51. Instead, the statute requires a trial court to find the existence of only one of the R.C. 2151.414(B) factors. See In re W.W., 1st Dist. Nos. C-110363 and C-110402, 2011-Ohio-4912, 2011 WL 4469147, ¶ 54 (observing that if one of *391 R.C. 2151.414(B)(1) factors exists, court need not find that other (B)(1) factors apply). Consequently, any error that may exist with respect to a reasonable-time finding would not constitute reversible error. See In re R.S., 4th Dist. Highland No. 11CA29, 2012-Ohio-2016, 2012 WL 1594247, ¶ 34. We therefore do not address the father's reasonable-time argument.
{¶ 64} Accordingly, based upon the foregoing reasons, we overrule the father's first assignment of error.
II
PSYCHOLOGICAL EVALUATION
{¶ 65} In his second assignment of error, father argues that the trial court violated his due process rights by denying his request that the child to undergo a new psychological examination. Appellee contends, however, that the evidence did not justify a new psychological evaluation and that father does not possess a due process right to demand that the child undergo a new psychological evaluation.
{¶ 66} "The right of a natural parent to the care and custody of his children is one of the most precious and fundamental in law." In re Adoption of Masa , 23 Ohio St.3d 163, 164, 492 N.E.2d 140 (1986), citing Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ; accord Lassiter v. Durham Cty. Dept. of Social Servs. , 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), quoting Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (explaining that "a parent's desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest"); In re C.F. , 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28 (stating that "[t]he right to parent one's children is a fundamental right"). Indeed, "the upbringing of children [is] among [the] associational rights th[e United States Supreme] Court has ranked as 'of basic importance in our society.' " M.L.B. v. S.L.J. , 519 U.S. 102, 116-17, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), quoting Boddie v. Connecticut , 401 U.S. 371, 376, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (citations omitted); accord In re B.C. , 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17, citing M.L.B. , 519 U.S. at 116, 117 S.Ct. 555 ("A parent's relationship with his or her child is among the 'associational rights' sheltered by the Fourteenth Amendment to the United States Constitution against unwarranted usurpation, disregard, or disrespect by the state."); Lehr v. Robertson , 463 U.S. 248, 257-58, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), quoting Prince v. Massachusetts , 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (" '[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' "). " '[T]he interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment.' "
*392 M.L.B. , 519 U.S. at 119, 117 S.Ct. 555, quoting Santosky , 455 U.S. at 774, 102 S.Ct. 1388 (Rehnquist, J., dissenting). Consequently, the parent-child relationship " 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " Lassiter , 452 U.S. at 27, 101 S.Ct. 2153, quoting Stanley v. Illinois , 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ; M.L.B. , 519 U.S. at 116, 117 S.Ct. 555 (stating that the parent-child relationship deserves "shelter[ ] * * * against the State's unwarranted usurpation, disregard, or disrespect").
{¶ 67} " '[F]ew consequences of judicial action are so grave as the severance of natural family ties.' " M.L.B. , 519 U.S. at 119, 117 S.Ct. 555, quoting Santosky , 455 U.S. at 787, 102 S.Ct. 1388 (Rehnquist, J., dissenting). "[P]arental status termination is 'irretrievabl[y] destructi[ve]' of the most fundamental family relationship" and permanently destroys " 'all legal recognition of the parental relationship.' " Id. at 121, 127-28, 117 S.Ct. 555 quoting Santosky , 455 U.S. at 753, 102 S.Ct. 1388, and Rivera v. Minnich , 483 U.S. 574, 580, 107 S.Ct. 3001, 3005, 97 L.Ed.2d 473 (1987). Indeed, "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' In re Smith (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 54. Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' Id. " In re B.C. , 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting In re Hayes, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). Thus, " 'state intervention to terminate [a parent-child] relationship * * * must be accomplished by procedures meeting the requisites of the Due Process Clause.' " Lehr , 463 U.S. at 258, 103 S.Ct. 2985, quoting Santosky , 455 U.S. at 752, 102 S.Ct. 1388 ; B.C. at ¶ 17 ("In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair.").
{¶ 68} The Due Process Clause contained in the Fourteenth Amendment to the United States Constitution states: "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *." The Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." The two clauses provide equivalent due process protections. State v. Aalim , 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15 ; State v. Hand , 149 Ohio St.3d 94, 2016-Ohio-5504, 73 N.E.3d 448, ¶ 11 ; Direct Plumbing Supply Co. v. Dayton , 138 Ohio St. 540, 544-545, 38 N.E.2d 70 (1941).
{¶ 69} "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Mathews v. Eldridge , 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). " '[D]ue process' has never been, and perhaps can never be, precisely defined." Lassiter , 452 U.S. at 24, 101 S.Ct. 2153. Instead, due process is "a flexible concept that varies depending on the importance attached to the interest at stake and the particular circumstances under which the deprivation may occur." Aalim at ¶ 22, citing Walters v. Natl. Assn. of Radiation Survivors , 473 U.S. 305, 320, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). "Applying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." Lassiter , 452 U.S. at 24-25, 101 S.Ct. 2153 ; accord Aalim at ¶ 22 ; In re B.C. , 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17, citing Santosky , 455 U.S. at 753-754, 102 S.Ct. 1388 ("In the context of termination of parental rights, due process requires that the state's procedural safeguards ensure that the termination proceeding is fundamentally fair."). "The fundamental requirement[s] of due process [are notice and] the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " Eldridge , 424 U.S. at 333, 96 S.Ct. 893, quoting *393 Armstrong v. Manzo , 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965) ; B.C. at ¶ 17.
{¶ 70} Determining what process is due and whether a parental rights termination proceeding is fundamentally fair generally requires courts to consider three factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Eldridge , 424 U.S. at 335, 96 S.Ct. 893 ; accord Lassiter , 452 U.S. at 27, 101 S.Ct. 2153 ; B.C. at ¶ 18.
{¶ 71} In the case at bar, we recognize that father possesses a significant private interest in the care, custody, and control of his child. See Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (recognizing parents' interest in the care, custody, and control of child "is perhaps the oldest of the fundamental liberty interests recognized by this Court"). "But it is not only [the father]'s private interest that we must consider." B.C. at ¶ 20. Instead, " ' "the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." ' " Id. , quoting In re Cunningham, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting In re R.J.C., 300 So.2d 54, 58 (Fla.App.1974). Accordingly, "parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." Id.
{¶ 72} In addition to examining a parent's interest in a parental-rights-termination action, courts also must consider the child's interest. Id. In the case sub judice, the child, at least initially, may have had an interest in preserving her familial relationship. However, the child later made it clear that she no longer wishes to preserve her relationship with her father and would like the foster parents to adopt her. The child indicated that she is fearful of her father and has threatened to harm herself if placed in his custody. Thus, her interest is "a permanent placement in a stable, secure, and nurturing home without undue delay." Id. , citing In re Adoption of Zschach, 75 Ohio St.3d 648, 651, 665 N.E.2d 1070 (1996). For " '[t]here is little that can be as detrimental to a child's sound development as uncertainty over whether [s]he is to remain in h[er] current "home," under the care of h[er] parents or foster parents, especially when such uncertainty is prolonged.' " Id. , quoting Lehman v. Lycoming Cty. Children's Servs. Agency, 458 U.S. 502, 513-514, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).
{¶ 73} In the case at bar, the evidence reveals that the child has displayed outward signs of distress due to the reunification process and permanent custody proceedings. The child's counselor and pediatrician both testified that the entire process has been detrimental to the child's mental health. Thus, the child possesses a significant interest in securing a permanent placement in a stable, secure, and nurturing home without undue delay. Prolonging her uncertainty would only continue to be detrimental to her sound development.
{¶ 74} The second Mathews factor evaluates the risk of erroneous deprivation of father's interest under the current procedures and the probable value, if any, of additional or substitute procedural safeguards.
*394 Id. at ¶ 21. In B.C. , the Ohio Supreme Court held that the current statutory procedures satisfy due process and minimize the risk of an erroneous deprivation of parental rights. The court explained:
Procedural safeguards already exist in parental-termination cases. R.C. Chapter 2151 contains the procedures for cases involving juveniles, including the award of permanent custody of a child away from the natural parents. R.C. 2151.01 requires courts to construe those provisions liberally in favor of retaining the family unit, "separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety." R.C. 2151.01(A). Division (B) further provides that the purpose of the statutes is also to "provide judicial procedures * * * in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced." For example, R.C. 2151.35(A)(2) requires testimony and other oral proceedings to be recorded; R.C. 2151.35(C) ensures parental notice of adjudicatory and dispositional hearings; R.C. 2151.352 gives the parent a right to appointed counsel; R.C. 2151.353(B) provides that when a motion for temporary or permanent custody is filed, parents shall be provided a full explanation that permanent custody permanently divests the parents of all rights and that temporary custody is the removal of the child from their legal custody.
R.C. 2151.414 sets forth the procedures that follow the filing of a motion for permanent custody, many of which are designed to protect the parent's interest in retaining the parent-child relationship. A hearing is required to be held within 120 days. R.C. 2151.414(A)(1). The agency moving for permanent custody must by clear and convincing evidence prove that the grant of permanent custody is in the best interest of the child. R.C. 2151.414(B)(1). Before awarding permanent custody, the court is required to consider all relevant factors, including the child's interaction and relationship with the parent. R.C. 2151.414(D)(1). A written report from a guardian ad litem must be submitted to the court before the hearing under R.C. 2151.414(C). Portions of the statute require clear and convincing evidence when the child cannot be placed with either parent within a reasonable period of time. R.C. 2151.414(D) and (E). The agency is required to prove that it used reasonable efforts to reunite parent and child. R.C. 2151.419(A)(1).
In summation, statutory protections already ensure that a parent faced with termination of parental rights has the opportunity to participate in the proceedings fully, with notice, representation, and the remedy of an appeal. We therefore hold that Ohio's current procedures comport with due process * * *.
B.C. at ¶¶ 25-27.
{¶ 75} Two decades before B.C. , the Third District Court of Appeals determined that the risk of an erroneous determination regarding a parent's mental health appears high when the parent does not have the resources to counter the state's expert psychiatric evidence. In re Shaeffer Children , 85 Ohio App.3d 683, 690, 621 N.E.2d 426 (3rd Dist.1993). The court explained: "Psychiatry is not an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, and on the cure and treatment." Id. The court thus determined "that the assistance of a psychiatrist to conduct an examination, to testify, and to *395 aid in preparing the cross-examination of the state's psychiatric expert witness would greatly reduce the risk of an erroneous determination on the mental health issue." Id.
{¶ 76} In the case at bar, we do not believe that permitting father to force his child to undergo an updated psychological evaluation is necessary to prevent an erroneous deprivation of his parental rights. The child has been in counseling since shortly after appellee obtained temporary custody. Father believed that the child should undergo a new psychological evaluation in order to determine the cause of her suicidal ideations. The child, however, made it clear why she had suicidal ideations-her fear of being placed in her father's custody. Thus, unlike Shaeffer , the case sub judice does not involve potentially differing psychiatric diagnoses, but instead the evidence is clear that the child's suicidal ideations resulted from her fear of being placed in father's custody. Moreover, father does not explain how an updated psychological evaluation would change this fact. Consequently, we do not believe that forcing the child to undergo an updated psychological evaluation is necessary to reduce the risk of an erroneous deprivation of father's parental rights.
{¶ 77} The final Mathews factor is the government's interest, including the function involved and the fiscal or administrative burdens of providing additional or substitute procedural requirements. "The government's interest is twofold. First, the state has an interest in minimizing fiscal and administrative costs." B.C. at ¶23. However, this interest does not override father's significant private interest in the right to a relationship with his child. Id." Second, the state has an interest in the function involved in these cases, i.e., the state's role as parens patriae in promoting the welfare of the child." Id.
{¶ 78} In the case at bar, we believe that the state's interest in promoting the child's welfare overrides father's private interest in his right to a relationship with his child. The reunification process and permanent custody proceedings have placed the child in a fragile emotional state, and she has consistently expressed her desire for the proceedings to end. Unfortunately, father fails to realize that what is best for him is not necessarily best for his child. While father's continued fight for his child may indicate that he deeply and sincerely loves his child, this case has reached the point of continued harm to the child. Consequently, under the circumstances present in the case at bar, we do not believe that due process mandates an updated psychological evaluation.
{¶ 79} Accordingly, based upon the foregoing reasons, we overrule father's second assignment of error.
III
{¶ 80} In his third assignment of error, father challenges the trial court's factual findings regarding his mental health diagnosis. Father contends that the court relied upon an outdated psychological evaluation and incorrectly determined that he suffers from narcissistic personality disorder. He further complains that the court ignored the conflicting diagnoses that the various witnesses offered.
{¶ 81} Even if we assume, arguendo, that the trial court's factual findings concerning the father's mental health diagnosis are against the manifest weight of the evidence, as we explain below we believe that the record contains abundant other evidence to support the trial court's permanent custody decision. An analysis of the best interest factors overwhelmingly shows that permanent custody is in the child's best interest, regardless of father's *396 mental health diagnosis. We additionally observe that regardless of the father's mental health diagnosis, his conduct speaks for itself.
A
INTERACTIONS AND INTERRELATIONSHIPS
{¶ 82} The child and father have a strained relationship, and the child is afraid of her father. The child has real or planted memories of her father being physically abusive to the child's mother. Although father and child enjoyed some of their visits, father had difficulty relating to the child as she matured. Father and child attempted family counseling to learn how to relate to each other, but both father's and child's counselors deemed the sessions so unsuccessful that they terminated them. Moreover, the child's counselor does not believe that additional family counseling would help the child, but instead, would continue to inflict emotional abuse. While father dearly loves his child, the father-child relationship is not healthy and will not allow the child to grow into a well-adjusted adult. In fact, the child has expressed escalating ways that she would attempt to escape from her father, if the court were to place her in his custody. Clearly, this is not an example of a healthy relationship.
{¶ 83} Also, the child enjoyed visits with her mother, but mother did not consistently visit the child. Mother also admirably admitted her inability to provide proper care for the child. Although the child would like to live with her mother, she understands that her mother cannot provide proper care.
{¶ 84} The child also shared a close relationship with her paternal grandparents, but the grandparents attempted to alienate the child from her father and even prevented the child from seeing her father for over one year. Fortunately, the child has thrived while in the foster home and is so bonded to the parents that she hopes they will be able to adopt her.
B
CHILD'S WISHES
{¶ 85} The child would like the trial court to place her in appellee's permanent custody so that the foster parents may adopt her. The child has no interest in living with her father. Also, the guardian ad litem recommended that the court award appellee permanent custody.
C
CUSTODIAL HISTORY
{¶ 86} The child has lived in the same foster home since her June 2014 removal. Between December 2010 and June 2014, the child was in her grandparents' legal custody. Between birth and December 2010, the child lived with her mother and father. The child has been in appellee's continuous temporary custody for well-over twelve months.
D
LEGALLY SECURE PERMANENT PLACEMENT
{¶ 87} "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." In re M.B. , 4th Dist. Highland No. 15CA19, 2016-Ohio-793, 2016 WL 818754, ¶ 56, citing In re Dyal, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); see also In re *397 K.M., 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, 2015 WL 7079930, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); In re J.H., 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, 2013 WL 1294646, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); In re J.W., 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); id. at 1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." M.B. at ¶ 56.
{¶ 88} In the case at bar, although father's home may be physically appropriate for the child, father has demonstrated that he is unwilling or unable to provide for the child's emotional needs. The child's counselor opined that father is emotionally abusive. Father's conduct during the family counseling sessions indicates that he is not willing to change his behavior in order to provide the child with the emotional security that she needs.
{¶ 89} The paternal grandparents do not have an appropriate home for the child and have not indicated that they are willing to take custody of the child.
{¶ 90} The foster parents have provided the child with a legally secure permanent placement for the more than three years, and they have also expressed a desire to adopt the child, if the court grants appellee permanent custody. Placing the child in appellee's permanent custody thus will provide the child with the best opportunity to obtain a legally secure permanent placement.
{¶ 91} Furthermore, the child clearly stated in her interviews with the trial court judge that she would harm herself if placed with her father or her grandparents. An environment in which the child threatens to cause herself harm is not a secure environment for the child. Understandably, the judge did not want to risk testing whether the child's statements constituted an attempt to manipulate the outcome or whether the child truly intended to harm herself or attempt suicide if placed with her father or her grandparents. While father stated that he did not believe the child would carry out any threats and that the child would be fine if placed in his care, a child's life is not a gamble. Witness credibility is a matter that is generally entrusted to the trier of fact.
{¶ 92} Based upon the foregoing circumstances, we are unable to conclude that the trial court's permanent custody decision is against the manifest weight of the evidence, even if the court did enter some incorrect factual findings relating to father's mental health diagnosis. We believe that father's observed behavior more than adequately supports the court's decision to grant appellee permanent custody, and that his behavior is more determinative than his actual mental health diagnosis.
*398 Moreover, the child could not have been more vehement about her desire for permanent custody so that her foster parents would be able to petition to adopt her. Here, we are heartbroken that the child has had to endure these proceedings for so long and has been subjected to such unpleasantness. The child's best interest demands the closure that our decision hopefully will provide.
{¶ 93} Furthermore, to the extent that father challenges the trial court's reliance upon facts that occurred before appellee filed its September 2016 dependency complaint, we point out that father stipulated to the admission of more than twenty exhibits filed in the prior case, including his 2014 psychological evaluation. Under these circumstances, he invited any error. See In re A.S. , 4th Dist. Pike No. 16CA878, 2017-Ohio-1166, 2017 WL 1181073, ¶ 41 (stating that appellant invited any error by acquiescing to the court's procedure); accord State v. Jackson , 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 108, quoting State ex rel. Kline v. Carroll , 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27 (" 'Under [the invited-error] doctrine, a party is not entitled to take advantage of an error that he himself invited or induced the court to make' ").
{¶ 94} Additionally, father did not object to any testimony presented at the permanent custody hearing on the basis that it related to circumstances that occurred before the September 2016 dependency complaint. Thus, he waived all but plain error. Father did not suggest that we review his assignment of error using a plain error analysis, and we decline to do so sua sponte. In re Z.R. , 9th Dist. Summit No. 26860, 2016-Ohio-1331, 2016 WL 1243546, ¶ 11 ; accord State v. Steers , 4th Dist. Washington No. 11CA33, 2013-Ohio-3266, 2013 WL 3895819, ¶ 20 ; State v. Suman , 4th Dist. Athens No. 10CA11, 2010-Ohio-6204, 2010 WL 5238625, ¶ 43.
{¶ 95} Accordingly, based upon the foregoing reasons, we overrule the father's third assignment of error.
IV
GUARDIAN AD LITEM'S REPORT
{¶ 96} In his fourth assignment of error, father asserts that the trial court erred by failing to exclude the guardian ad litem's report. In particular, he claims that the guardian ad litem failed to meet the minimum requirements of Sup.R. 48.
{¶ 97} Appellate courts will not reverse trial court decisions to admit a guardian ad litem's testimony and recommendation unless the court abused its discretion. Corey v. Corey, 2nd Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, 2014 WL 3731776, ¶ 9 (stating that "whether to consider the report of a GAL when the GAL did not fully comply with Sup.R. 48(D) is within a trial court's discretion"); Smith v. Boyd, 3rd Dist. Seneca No. 13-05-49, 2006-Ohio-6931, 2006 WL 3803720, ¶ 34 ; see Nolan v. Nolan, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, 2012 WL 3542256, ¶ 26 (concluding that trial court abused its discretion by considering guardian ad litem's testimony when guardian ad litem failed to even minimally comply with Sup.R. 48 ); see, e.g., Estate of Johnson v. Randall Smith, Inc., 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 22 (stating that trial court decisions regarding admissibility of evidence reviewed using abuse-of-discretion standard). A trial court does not abuse its discretion unless it acts in an unreasonable, arbitrary, or unconscionable manner. Estate of Johnson at ¶ 22.
{¶ 98} The purpose of a guardian ad litem "is to protect the interest of the child and 'assist a court in its determination *399 of a child's best interest.' " In re C.B., 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14, quoting Sup.R. 48(B)(1) and citing R.C. 2151.281(B). "[T]he guardian's role is to 'perform whatever functions are necessary to protect the best interest of the child, including, but not limited to * * * monitoring the services provided the child by the public children services agency * * * [and filing] any motions and other court papers that are in the best interest of the child.' " Id. , quoting R.C. 2151.281(I). The guardian ad litem has "the unique role" to ensure that the trial court considers the child's best interests before reaching a custody decision. Id. Due to this unique role, "the guardian ad litem has a statutory right to ensure that the best interests of the child are enforced and protected in the permanent-custody proceeding." Id.
{¶ 99} A guardian ad litem 's function in a juvenile proceeding is "to provide the court with relevant information and an informed recommendation regarding the child's best interest." Sup.R. 48(D). A guardian ad litem's general duties include investigating the background of the parents and delivering a report and recommendation to the court regarding the child's best interests. In re C.D.M., 4th Dist. Hocking No. 13CA1, 2013-Ohio-3792, 2013 WL 4734804, ¶ 25. Sup.R. 48(D)(13) also outlines more specific duties.[4] Sup.R. 48(D) is not, however, "the equivalent of [a] rule[ ] of procedure and ha[s] no force equivalent to a statute." State v. Gettys, 49 Ohio App.2d 241, 243, 360 N.E.2d 735 (1976) ; see Pettit v. Pettit, 12th Dist. Fayette No. CA2011-08-018, 2012-Ohio-1801, 2012 WL 1413930, ¶ 12 (stating that the superintendence rules are "administrative directives only, and are not intended to function as rules of practice and procedure"). Instead, Sup.R. 48(D) is an " 'internal housekeeping rule[ ] which [is] of concern to the judges of the several courts but create[s] no rights in individual[s].' " In re E.W., 4th Dist. Washington No. 10CA18, 2011-Ohio-2123, 2011 WL 1734064, ¶ 12, quoting State v. Gettys, 49 Ohio App.2d 241, 243, 360 N.E.2d 735 (1976).
*400 {¶ 100} This court has interpreted Sup.R. 48(D) as a general guideline for the conduct of the courts that does not create substantive rights. E.W., citing In re K.G., 9th Wayne App. No. 10CA16, 2010-Ohio-4399, 2010 WL 3619966, ¶ 11; Allen v. Allen, Trumbull App. No.2009-T-0070, 2010-Ohio-475, 2010 WL 520806, ¶ 31 ; Sultaana v. Giant Eagle, Cuyahoga App. No. 90294, 2008-Ohio-3658, 2008 WL 2837325, ¶ 45. Thus, we have generally refused to conclude that a guardian ad litem's failure to comply with Sup.R. 48(D) constitutes grounds for reversal. In re C.T.L.A., 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, 2014 WL 1413898 ; In re R.S., 4th Dist. Highland No. 11CA29, 2012-Ohio-2016, 2012 WL 1594247 ; E.W. Other courts have concluded that a guardian ad litem's failure to comply with Sup.R. 48(D) is not automatic grounds for excluding the guardian ad litem's testimony, report, or recommendation. Corey at ¶ 10 (rejecting argument that trial court abused its discretion by considering guardian ad litem's report even if guardian ad litem failed to comply with Sup.R. 48(D) ); In re E.S., 6th Dist. Ottawa No. OT-14-008, 2014-Ohio-3067, 2014 WL 3408552, ¶ 64 (concluding that trial court did not abuse its discretion by admitting guardian ad litem's testimony and report even though appellant complained guardian failed to comply with Sup.R. 48(D) ).
{¶ 101} In the case sub judice, father does not have any substantive right to enforce under Sup.R. 48. Instead, the rule is a general guideline that does not have the force of statutory law. Thus, any non-compliance with the rule is not grounds for reversal.
{¶ 102} Furthermore, we do not believe that the trial court abused its discretion by considering the guardian ad litem's testimony and recommendation. Father extensively questioned the guardian ad litem about her recommendation, her qualifications, and the extent of her investigation. Father also ensured the trial court was well-aware that he did not believe that the guardian ad litem performed an adequate investigation. The trial court, as the fact-finder, is permitted to assign weight to the guardian ad litem's testimony and recommendation and could choose to believe or disbelieve it. In re M.Z., 9th Dist. Lorain No. 11CA010104, 2012-Ohio-3194, 2012 WL 2874375, ¶ 35 (stating that trial court permitted to "believe or disbelieve the guardian's testimony and to consider it in the context of all the evidence before the court"); Hunter-June v. Pitts, 12th Dist. Butler No. CA2013-09-179, 2014-Ohio-2473, 2014 WL 2568602, ¶ 21 ("The trial court heard the context and the explanations of the guardian ad litem with regard to her investigation and in support of her recommendations, which were outlined in a 11-page report. * * * [T]he guardian ad litem was questioned by both parents' counsel. The magistrate was entitled to believe or disbelieve her testimony and to consider it in light of all of the other testimony presented at the hearing."). Here, we find nothing unreasonable about the trial court's decision to consider the guardian ad litem's testimony and recommendation.
{¶ 103} Father nevertheless asserts that our decision in Nolan v. Nolan, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, 2012 WL 3542256, requires us to conclude that the guardian ad litem's alleged failures require us to reverse the trial court's decision. In Nolan, the guardian ad litem failed to interview the child, the mother's live-in boyfriend, the child's half-sister, school personnel, and medical-health providers. Additionally, the guardian ad litem did not visit either parent's home.
{¶ 104} On appeal, father asserted that the trial court should have stricken the *401 guardian ad litem's report and recommendation because the guardian ad litem failed to adhere to Sup.R. 48. Judge Kline, writing for the court, agreed and reversed the trial court's decision. However, two other judges concurred only in the judgment. Also, the court explicitly indicated that its decision is limited to the "specific facts of this case" and that it did not "intend to create a bright-line rule regarding the minimum standards of Sup.R. 48(D)(13)." Id. at ¶ 27. The court stated: "based on the unique facts of this case, we find that the guardian ad litem failed to adequately investigate the [c]hild's situation." Id. Thus, the court concluded that the trial court should have stricken the guardian ad litem's trial testimony and report. Id. However, because the court specifically limited Nolan to its facts, we do not find it applicable to the case sub judice.
{¶ 105} Consequently, we do not agree with the father that the trial court abused its discretion by considering the GAL's report and recommendation.
{¶ 106} Accordingly, based upon the foregoing reasons, we overrule appellant's fourth assignment of error.
V
A
{¶ 107} In their first assignment of error, the grandparents assert that the trial court abused its discretion by (1) allowing appellee to introduce evidence from the prior case, and (2) suspending their visits with the child.
1
{¶ 108} The grandparents first claim that the trial court abused its discretion by allowing the parties to introduce evidence from the 2014 dependency case. We observe, however, that the grandparents did not object to any of this evidence during the permanent custody hearing. Therefore, they have waived all but plain error. Moreover, they have not suggested that we review this assignment of error using a plain error analysis and we decline to do so sua sponte. In re Z.R. , 9th Dist. Summit No. 26860, 2016-Ohio-1331, 2016 WL 1243546, ¶ 11 ; accord State v. Steers , 4th Dist. Washington No. 11CA33, 2013-Ohio-3266, 2013 WL 3895819, ¶ 20 ; State v. Suman , 4th Dist. Athens No. 10CA11, 2010-Ohio-6204, 2010 WL 5238625, ¶ 43.
2
{¶ 109} The grandparents next assert that the trial court abused its discretion by suspending their visits with the child. They claim that (1) the court should have held a hearing before suspending their visits, and (2) the court's decision to suspend their visits constituted an abuse of discretion because the court did not base its decision upon any facts in evidence, but instead, only upon the GAL's speculation. The grandparents do not, however, pinpoint how any alleged erroneous suspension of their visits with the child affected the trial court's decision to place the child in appellee's permanent custody. Moreover, the grandparents did not request the court to place the child in their legal custody. We therefore do not believe that any error that might have occurred affected the grandparents' substantial rights. See Civ.R. 61 (explaining that court "must disregard any error or defect in the proceeding" that does not affect a party's substantial rights); Niskanen v. Giant Eagle, Inc. , 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 26, 912 N.E.2d 595, quoting Smith v. Flesher , 12 Ohio St.2d 107, 110, 233 N.E.2d 137 (1967) (explaining that " 'in order to secure a reversal of a judgment,' " a party " 'must not only show some error but must also show that error was prejudicial to him' ");
*402 Theobald v. Univ. of Cincinnati , 160 Ohio App.3d 342, 2005-Ohio-1510, 827 N.E.2d 365, ¶ 17 ("When avoidance of the error would not have changed the outcome of the proceedings, then the error neither materially prejudices the complaining party nor affects a substantial right of the complaining party.").
{¶ 110} Accordingly, based upon the foregoing reasons, we overrule the grandparents' first assignment of error.
B
{¶ 111} In their second assignment of error, the grandparents contend that the trial court erred by determining that appellee used reasonable efforts to reunify the child with her family. We point out that we previously discussed this issue within father's first assignment of error and do not repeat our analysis here. Instead, we simply note that the record supports the trial court's findings that appellee used reasonable efforts.
{¶ 112} Accordingly, based upon the foregoing reasons, we overrule the grandparents' second assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
Harsha, J.: Concurs in Judgment & Opinion
Hoover, P.J.: Concurs in Judgment Only
Attachment
APPENDIX
I
THE CHILD'S IN CAMERA INTERVIEWS
The court interviewed the child twice. The first interview occurred on November 1, 2016, before appellee filed its permanent custody motion. During the November 1 interview, the child stated that she does not want to live with either her father or the grandparents. The child indicated that if she had to choose where to live as of November 1, 2016, she would hope to "be real quick adopted." She explained that she does not want to live with her father because she is afraid that he would return to his past abusive behavior.
The child described her relationship with her father as "okay," but she feels that "he won't let [her] be a kid and stuff." The child additionally related that she is "real nervous when [she is] around [her] dad." She explained that if she sees her father at a store when she is with her foster parents she "shut[s] down," "start[s] crying," and tries "to hide." "[I]t's like [she] just want[s] to get away." She stated that she felt "closed in" when she lived with her grandparents and felt that she could not express her feelings.
The second interview occurred on March 8, after appellee filed its permanent custody motion and after the court suspended the father's and the grandparents' visits. During her March 8 interview, the child stated that her visits with the father "aren't really going so well" and that "there have been numerous times when visits haven't gone good." The child indicated that the visits are sometimes stressful. The child explained that during one of the visits, the visitation monitor asked the father to change the subject, and the father "got mad and said that he felt like he couldn't be a father, and asked to go to the bathroom." When he returned, he stated that "the visit was over" and ended the visit early. Before another visit, the father and Tammy (the father's new wife) got their car stuck in the mud, and he arrived to the visit in an angry mood. Upon arrival, the father stated that he "knew [he] should've stayed home" and that he "had better things to do." The child asked herself *403 why he visited if he had better things to do.
The child stated that her father punished her during one visit. She explained that the father claimed that she lied, but he did not further explain what she supposedly lied about. As punishment, the father made her write 500 sentences that stated, "I will respect dad and Tammy."
The child explained that when her father stopped attending visits, he advised her that he was not attending visits because his doctor advised him that "he couldn't be under a lot of stress." The child stated that her father's comment made her "mad because if [he] can't deal with stress, why be in this situation?"
The child explained that during family counseling, her father would get mad if she said something that he did not like. She asked him at one point "why he beat [her] mom" and "he denied it, even though [she saw] him, he denied that [she saw] it, and also denied that he did it!" The child believed that they discontinued family counseling because when she would "say something, or do something he didn't like, he'd get mad." She explained that if she asked him a question, he would not answer it but would instead ask her a question. For instance, if she asked him why she could not cut her hair, he would say, " 'Well, would it be okay for me to drink beer and stuff?' " The child indicated that she "had to leave early from a session * * * to like calm down and stuff" and her father "got mad!" He stated, " 'I'm gonna [sic] end this session!' "
The child discussed another occasion when she and her father played a game, and the question, "Who is your hero," arose. The child responded that her hero is her foster mother, and her father became mad. She stated that her father believed he should be her hero and no one else.
The child advised the judge that if she cannot live with her mother, which she understands is not possible, she would like the court to place her in appellee's permanent custody. The child indicated that she understands that permanent custody means she would no longer have any relationship with her father. When the judge asked her if that is what she really wants, the child stated, "Okay, that sounds really bad, but yeah."
The child explained that she "love[s]" living with the foster family and that she feels "great," like she is "loved" and "wanted." She additionally stated that she feels more normal with the foster family because she is no longer home schooled and does not feel isolated.
The child related that her father's religious beliefs forbid her from wearing pants and cutting her hair, but she would like to be able to do so. She indicated that she nonetheless does not wear pants, even when not with her father, because "if he gets wind of it he's gonna get really mad and try to use that against us in court." The child stated that she does not desire to be placed in appellee's permanent custody simply because of her father's religious beliefs. Instead, "[i]t's because of things that he'd do in the past." She is frightened "that he's gonna do it to me like he did with [word not understood for transcription] when he beat her, and I'm just scared that he's gonna do that to me."
The child further explained that she does not believe that her father allows her to state how she feels. She related that she has told him several times that she does not want to live with him, which "took a lot of guts." She also indicated that she is afraid of her father's anger and does not believe he will change. The child informed the court that if she were "sent home with *404 either [her] grandparents or [her] dad, [she] would run away."
II
PERMANENT CUSTODY HEARING
A
CHILD'S PROVIDERS
1
Maureen Kiley
Maureen Kiley provided counseling for the child and conducted seventy-two individual sessions with the child and six family sessions. Her first evaluation occurred in October and November of 2014, and she continues to counsel the child on a weekly basis.
Kiley diagnosed the child with "adjustment disorder unspecified." The child indicated that she was afraid of her father-she has memories of him hurting her mother, and another memory when Tammy and her father "beat some man with a pipe."
The child continuously "report[ed] that she was afraid of her father." She wanted "to see her father, but only at the Advocacy Center." While in foster care, if the child saw her father at a local store, the child became fearful that he would "grab her and take her." The child indicated that she would run away if placed with her father. She also stated that she "thought of just jumping off a bridge."
Kiley stated that she did not recommend the child engage in family counseling at any point while appellee held temporary custody. She did not even believe it was appropriate when it began in November 2016.
Kiley stated that during the first family counseling session, the child was crying and the father had difficulty "relating to any feelings." Kiley asked the father to look at the child and "tell [her] what he thought he saw." The father stated "that he saw a different child who was nervous. He also said he saw disgust and anger with [the child.]" Kiley stated that the situation was "awkward" and the father stated that "he felt uncomfortable."
When the child asked the father why she could not wear makeup, cut her hair, or wear pants, the father responded, "Be yee not conformed of this world," and started to discuss "why he was different."
Another time, the child asked her father about hurting the mother and "he was very defensive. He said things like 'I tried to marry your mother. I tried to help her get a divorce.' * * * 'I bought her a ring and she didn't want it.' " The child told her father that she saw him hurt her mother, but the father denied it. Kiley explained that even if the father denied it, "if he could have acknowledged the fact that those were [the child]'s memories and perceptions, and could have apologized for the fact that those were things that hurt her; if he could have acknowledged any part of her thoughts and feelings, but she felt resistance. Complete resistance."
Kiley explained that the child displayed signs of stress during family sessions-she did not want to make eye contact with her father and she refused hugs. Kiley stated that the child rated one session a "five," and then when she returned to Kiley's office, stated, "It's really an eight." During another session, the father "was going on and on and on, and there were so many issues that he was bringing up, and [she] noticed that [the child] was uncomfortable." Kiley asked the father if the child could respond. The father stated something like, "If she wants to interrupt [me] or be disrespectful."
*405 Kiley did not believe the father was receptive during family sessions-he "denied [the child]'s thoughts and feelings consistently. That's what hurt her." She does not believe that the child and the father made any progress in building a healthy relationship. Kiley explained that she did not notice "bonding" between the father and the child: there was a "lack of eye contact," a "lack of give and take conversation," a "lack of understanding, or being concerned * * * for each other's feelings or thoughts."
At the last family session, Kiley asked the child and the father if they thought the sessions were productive. The father indicated that "he was tired of playing games; and what he wanted was more one-on-one time" with the child. This is when the child "refused to hug, and walked out." Kiley stated that the child became "tired of" the family sessions, "didn't want any more family sessions" and "was very relieved" when informed that they were terminated until further notice. Kiley does not believe the child would benefit from additional family counseling and explained that the child "has no desire to have that family therapy." Kiley indicated that if the child is an "unwilling participant," then continued counseling may not be "therapeutic."
Kiley related that she wants to believe that the father cares about the child, "but his behavior in our family sessions really distressed [her]!" Kiley indicated that the father "lectured" the child, "didn't listen to [the child's] thoughts," and "didn't seem to care about [the child's] feelings." Kiley explained that the father "had six sessions to demonstrate. We bent over backwards to try to help him, and to try to work with that. The entire time I knew that [the child] didn't want it. But, I was sitting there with him asking him to participate, asking him to look at her and tell me what he saw[.] He struggled with all of that. And he continued to be rude to me; and I thought he was rude to [the child], too. So, he didn't indicate any desire to do any changing. His thinking was very rigid and very concrete."
Kiley believes that the father has been "emotionally abusive" to the child. She stated: "He doesn't listen to her thoughts and feelings. That is one clear symptom of emotional abuse." The father "dominated a lot" of the family sessions, and it caused the child to withdraw. Additionally, the father "wouldn't acknowledge [the child's] thoughts or her feelings," "he wanted to dominate," and "he wanted to tell his story, but he wasn't willing to listen to hers."
She does not believe that additional family counseling is "indicated" based upon her observations of the six sessions. Kiley stated that ordinarily, when families undergo counseling in order to facilitate reunification, the families are "willing to come in and they all know they're going to have to make some adjustments." But Kiley did not find that "to be the case" with the child and the father. Kiley "would not suggest that [the child] be exposed to [additional family counseling]. It's just more abuse."
Kiley explained that she created a safety plan for the child in response to the child's suicidal ideations. The child stated that "she had thoughts of shooting herself; or jumping off a bridge." Kiley indicated that the child's "triggers are getting in trouble with adults' and thoughts of going home with [her] dad or grandparents." Kiley recommended that the child see her pediatrician for a depression screening. The pediatrician prescribed medication.
Kiley stated that since being on the medication, the child's "affect has improved, and she's noted that she feels better." Kiley noted "a significant difference" between the child as she is now and as she was when she first began therapy: "Her *406 affect has improved. Her reading and math skills have improved. * * * * Her ability to function has improved at school and at home, even though there are still struggles."
Kiley explained that even given the child's recent thoughts of self-harm and suicide, her basic diagnosis remains adjustment disorder-but with the thoughts of suicide, she would add on "anxiety and depressed affect." Kiley stated that this change would not render her current treatment irrelevant, but instead, "[t]he goals are going to be similar. Very similar."
Kiley explained that in March 2017, the child expressed that she wanted to harm her father, but Kiley did not "give it a lot of credence." The child stated that "she was going to find a gun or something of that nature * * * or steal a tablet." Kiley related that although she did not give the child's statements "a lot of credence," she believed the child "felt strongly about not wanting to go back and live with her dad." Kiley indicated that the child fears that the court will place her with her father. Kiley would be concerned for the child's well-being if placed with her father, "[b]ecause emotionally she's not willing to do this. She's said over-and-over again she's going to get out of that situation one way or another." Kiley additionally believes that continuing the child in appellee's temporary custody would be "counter-productive." Kiley explained that the proceedings have "created more and more stress, and things are escalating. [The child is] thinking of ways to get away and out of this situation. She's looking for closure."
2
Dr. Deborah Blackwell
Dr. Blackwell is the child's pediatrician. In 2013, the grandmother brought the child for a well-child visit and reported that the child "had been exposed to a meth lab" and "had some comments regarding dead animals." Dr. Blackwell noted that the child had an anxiety problem, but the child appeared to be "tolerating her level of anxiety fairly well." Dr. Blackwell believed that the child's "anxiety was probably secondary to what [appeared to be] post traumatic stress disorder."
Dr. Blackwell saw the child again in 2014, after the child had entered foster care, and believed that the child "was moving into a more mild depressive behavior disorder."
Dr. Blackwell also saw the child in March 2016. The nurse attempted to administer a standard patient health questionnaire for depression. The child refused to answer any of the questions. The child "seemed very, very anxious." Dr. Blackwell described the child's demeanor during this visit as "extremely fragile." The child "was kind of cowering in her seat, shaking, and just looking very, very agitated" and "upset." The child "was upset because the biological father had been in the room earlier, and she was upset because she had not known that he was going to be there." The doctor asked the child why she seemed so anxious, and the child stated, " 'It's because my father was in the room.' And when she saw him choking her and hitting her mother, and that made her very, very anxious. So upon seeing him again she became very anxious again." Before this March 2016 visit, Dr. Blackwell had seen the child for other office visits and had not noticed this type of behavior. The doctor diagnosed the child with "an adjustment reaction with an emotional overlay due to her state of anxiety."
Dr. Blackwell saw the child on January 30, 2017 for depression. The child reported that she felt hopeless and depressed more than half of the days. She was having *407 trouble sleeping and had very little energy. She was starting to feel bad about herself, as if she had let someone down. The child scored an 11 on a public health questionnaire that placed her in the degree of moderate depression. Dr. Blackwell's January 30, 2017 records do not reflect that the child had expressed any thoughts of suicide, but the child reported that she felt that she was becoming increasingly depressed with the thought of being placed with her father or grandparents. The doctor prescribed Prozac.
Since January 2017, the child has had several follow-up visits and has progressed well. Dr. Blackwell reported that the child expressed disappointment that she might be placed with her father, but she appeared better able to cope. The child seemed calm and safe with the foster parents. Dr. Blackwell indicated that she changed the medication to Lexapro due to concerns that Prozac may cause suicidal ideations.
Dr. Blackwell stated that the permanent custody hearing has "been devastating to" the child. She believes that the child's reactions did not result from Prozac"but from her * * * inability to cope with the stress of this environment, and again the possible relocation." The child was "extremely upset about how long this has taken, the pressure that's been put upon her, and the potential of her relocation."
Dr. Blackwell saw the child on May 9, 2017-a few days before the doctor testified-and asked the child what she hoped would result from the permanent custody hearing. Dr. Blackwell stated that the child reported that she "was not looking forward to returning to her father, or the grandparents, unfortunately."
Dr. Blackwell additionally explained that she did not learn until May 9 that the child and the father had engaged in family counseling sessions. She stated: "There is absolutely no question in my mind * * * that the reason for [the child's] agitation, anxiety, threatening to hurt others, and almost total breakdown was this hearing and the potential with being back with her biological father." Dr. Blackwell stated that the child indicated that she would like "to get on with her life" and commented that "it is ridiculous to think that she would have to go back into that environment." Dr. Blackwell does not think the counseling itself caused the child's anxiety, but rather, "[t]he process of reunification."
Dr. Blackwell saw the child progress from anxiety to an "inability to handle the anxiety." The doctor believes that the child is "[m]axing out her capacity to deal with the stresses in her life currently." The child's current depression diagnosis results from the uncertainty of the legal proceedings and her future, as well as the recent threats she has made. The child has not expressed any concern about remaining in her current placement. She seems "[a]t ease, and very comfortable with" the foster parents. If she were placed with her father or grandparents, "it would be extremely detrimental for her."
When questioned whether bullying at school could be the cause of the child's problems, the doctor explained that if she believed bullying was the root of the child's problems, then the doctor would have put a note in the chart. Instead, the presence of notes in the chart about the child's anxiety with the thought of returning to the grandparents or being placed with her father illustrates "how significant it is that [she] would actually take the time to hand type something into [her] chart that is not pre-set, something that I thought was very significant. So those notations are extreme concerns of mine that I would actually take the time * * * to *408 actually type that much information into a chart."
B
GUARDIAN AD LITEM
The GAL believes that it is in child's best interest to grant appellee permanent custody. Even though the father has undergone counseling, "his relationship with [the child] has not been improved to the point where [the GAL] feel[s] that it would be in her best interests or even safe for her to be reunified with him." In the three years that the child has been in appellee's custody, the father has not reached "the point where he can visit her outside the agency." She does not believe that will "chang[e] any time in the near future."
The GAL noted that the child is now thirteen and has "been in a state of flux her entire life." The child consistently stated that she would like appellee to receive permanent custody and that she would like to be adopted. The GAL believes that the child needs a stable, secure, and permanent placement.
Throughout the time that the child has been in appellee's temporary custody, the child has been willing to visit with her father at the FAC but "she's never wanted to be in his custody." The GAL believes that "the family counseling made the relationship worse." She explained that the child initially was willing to visit with the father at the FAC but "now she no longer wants to have any contact with him."
The child's suicidal ideations caused the GAL concern, and she recommended that visits stop due to the child's suicidal ideations. The GAL explained that the child's counselor called the GAL, and the GAL detected that the counselor "was very concerned." The GAL felt that she "needed to do something." The GAL spoke with the child, and she thought that her "only option at that point in time was to ask the court to suspend any visitation before any harm could come to [the child]." The child has been "very anxious" over the custody proceedings and has asked the GAL "when it will be over." The GAL noticed that the child's suicidal ideations "correspond with when we're having a court date."
The child "seems very relaxed and at ease" in the foster home. "Since she has been in the foster home, she is open, she laughs, she talks, we sit down, we have conversations, she tells me all about what she's doing, she talks about her classes, what books she's reading. I mean she's open. She talks and just talks and just talks."
The GAL stated that the mother does not have a home and that the grandparents live in a camper without running water or electricity. The GAL further indicated that the grandparents "have flagrantly disregarded orders of this court." The GAL has "no faith that they would ever follow any orders of the court." The GAL believes that the grandparents "have done their best to alienate any relationship that [the child] might have had with her father. And if placed back with her, I don't have any faith that they would ever try to foster any sort of relationship with any of the family members."
The GAL asserted that the grandparents told the child "stories about [her father] that were either completely untrue or partially untrue in order to scare her, to create fear in her of him." For instance, the grandparents told the child that her father ran over her dog, "then backed up and ran over the dog again, and ran over it until it was flat as a pancake." The child "related this story to [the GAL] as if she had seen this occur." The GAL stated to the child, "Oh, I'm so sorry you saw this."
*409 The child responded, "Oh, I didn't see it. Grandpa told me this happened."
In response to the insinuations that the child "only wants to be adopted so she can have more freedom to do things like cut her hair and not wear skirts," the GAL believes the child has more mature reasons than that: "So she can have a stable home. She won't be in limbo anymore."
On cross-examination, the GAL explained that she did not interview the father for her most recent report. The court asked her why she did not, and the GAL stated that the father "didn't get in contact with me." The GAL stated that the father also told her "at one point not to contact him, to go through his attorney." The GAL agreed that she did not contact the father's attorney but stated that she "didn't have any questions" because she knew "what his wishes are." The GAL also agreed that she did not visit the father's current home, but explained that she does not have any concerns regarding the physical appropriateness of the home or the father's financial ability to provide for the child's material needs.
C
FATHER'S PROVIDERS
1
Marsha Skaggs
Marsha Skaggs diagnosed the father with "adjustment disorder with anxiety." She developed a service plan for the father that identified goals and objectives that are measurable so as to determine whether he made progress. The father's plan was to help him be "less anxious with his current situation," which included gaining an "understanding of adolescent development" and "the impact of his behavior on his child," and learning "some personal skills for interacting with others in a more positive, productive manner." Skaggs stated that the goal of the father's counseling was not to change his beliefs, but to gain an understanding of other perspectives or "to moderate his presentation at times in light of how children receive information."
Skaggs explained that she encouraged communication, calming, and listening skills. She indicated that although the father "heard" her, she does not "believe that he was necessarily receptive." Skaggs stated that the father felt that as the parent of his daughter, he was responsible entirely for her until she reached adulthood.
Skaggs stated that the father "was very much interested in getting [the family sessions] started as soon as possible." She conferred with the child's therapist to ascertain when the child would be ready to proceed. She explained that the family sessions began in the middle of November 2016 and that six were held until mid-January 2017, when they were deemed ineffective.
Skaggs believes that the father and the child made "very little progress * * * during those six family sessions." Skaggs indicated that the child displayed frustration when she asked questions of her father and he did not provide direct answers. For instance, when the child asked why she could not cut her hair, wear pants, or wear make-up, her father did not give her a direct answer but instead spent "several minutes explaining his position." When the father explained why the child could not cut her hair, rather than citing religious reasons, the father went into a long explanation of how he was the parent and it was his job to make decisions. When the child brought up past events, the father did not validate her perception.
Skaggs indicated that during family counseling sessions, the child sometimes *410 "would turn away from her father" and "look down." The father would ask her to look at him, but "she would not be able to do that. One time she asked to leave the session." She does not believe the father "had an understanding of the impact of his responses on his daughter."
Skaggs discussed her concern with the father, "[i]n terms of trying to provide education around the needs of an adolescent, and typical development of an adolescent, and how it might be very difficult if the child felt like they had no choice, or little voice." The father did not seem to understand this concept.
Skaggs explained that although she believes both the father and the child were willing to try, family counseling sessions stopped "based on observation of progress and level of distress." She stated: "It was determined that it was more stressful than helpful at the point that it ended." She also was concerned about the level of stress the father reported. The father informed Skaggs that following a family session, he sought medical treatment due to the stress of the situation. Skaggs indicated that she would not classify the family counseling sessions as "completed" or "productive."
Skaggs related that they do not have plans to resume family counseling and that the father no longer is engaging in individual counseling sessions. The father indicated that "the individual therapy sessions were not helpful." Skaggs, however, believes that the individual sessions are necessary and thinks they should continue. She nevertheless agreed that "for any client to benefit from therapy, there needs to be an assessment of where they are in terms of willingness to change" and that the father did not demonstrate a willingness to change. Skaggs expressed concern regarding the father's ability to proceed if he was unwilling to change. She believes continued "individual counseling would only be helpful if there was a willingness to look at things from other prospective [sic] and consider * * * at least contemplate making a change." Skaggs indicated that the father did not appear to endorse this approach.
Skaggs related that during the father's individual counseling, the father "gained some understanding of the importance of how he presents in taking care of himself." She does not, however, "know that he gained understanding of parenting adolescence [sic]." She is uncertain whether "he fully understood the impact of his behavior and responses on his daughter."
2
Dr. Bobbie Hopes
In October 2014, psychologist Dr. Bobbie Hopes evaluated the father. As part of her evaluation, she reviewed some of the court documents. The documents indicated that (1) the parents attempted to alienate the child from the other parent; (2) the child witnessed domestic violence between the parents; (3) there were concerns regarding the child's home schooling and her academic progress; (4) the child stated that she missed her grandparents but did not want to live with them; and (5) she missed her father but she "had some fear of him."[5]
The visitation documents Dr. Hopes reviewed stated that the father "was overly controlling" and "seemed to be trying to alienate [the child] against her foster parents." Additionally, the father appeared to *411 have an "antagonistic relationship" with the children services workers.
Dr. Hopes also learned that the grandparents believed that the child "died at a very young age * * * and that God brought her back to life from the dead. And * * * that she now had developed healing powers as a result of her experience, and it was their job to instruct her as to how to use her healing powers, and [the father] objected to that, and did not agree with that."
During Dr. Hopes' interview with the father, the father indicated that he was charged with domestic violence but claimed that it was "collusion" between his ex-wife and his parents. The father further believed his parents were attempting to alienate the child.
The father reported that in 2011, he went to Family Resources Services "because he wanted to be able to prove he was a good father; and he thought that getting an evaluation would prove that. And he said that they told him they had nothing to offer him." He reported that he took anger management classes in 2011 twice a week for three months. The father indicated that he learned "to do breathing techniques to calm himself down" and "to walk away," but the father "kind of laughed and admitted that he doesn't always do that."
Dr. Hopes administered an MMPI and a sentence completion test. The father's MMPI "results were mildly defensive." She explained that "when the MMPI results are defensive, that lowers the scores on any of the other scales, making it difficult, if not impossible, to know for certain whether there were things he was not reporting that might have been negative." On the sentence completion test, the only thing she found significant was his response to, "I am really afraid of...." She stated that the father responded, "Being misunderstood." She explained that she believes "that is an issue for him, that he feels very misunderstood."
Dr. Hopes opined that father has paranoid personality disorder (PPD). She described PPD as "a chronic mal-adaptive [sic] pattern, follow behavior, attitudes, perceptions, * * * that are highly resistant to real world consequences, and * * * resistant to treatment." Dr. Hopes explained that individuals with this disorder
are suspicious, distrustful, [and] feel greatly misunderstood. They often do not take responsibility for their own behavior. They're quick to blame somebody else for something that went wrong. They tend to make mountains out of a molehill. If they're slighted, or somebody doesn't talk to them, they feel that they've been offended, or greatly criticized. They tend to be cold. Distant. Lacking in empathy. Having difficulty putting themselves in another person's shoes. And generally fearful of other people; believing that other people are out to hurt them.
And because of those fears, they tend to react aggressively, either verbally or physically as to what they perceive, as often a greater thought than actually exists.
Additionally, "[t]heme controlling is a characteristic of [PPD]." A person with the disorder "tends to get in trouble," "to alienate people," to be "litigious," or to be "in trouble with the law if they act out inappropriately with their verbal retaliation, or their physical retaliation." The father in particular "tends to alienate the people who are there to help him with reunification."
Dr. Hopes stated that PPD "is almost impossible to change * * * especially in someone [the father's] age." She stated that individuals with the disorder are "not *412 receptive to treatment in general. And that's partly why it's so difficult to treat, because they don't see anything as being their fault, it's somebody else's fault, so why do you want to fix me?" She clarified, however, that treatment can "help them with particular behaviors" and "develop skills." Dr. Hopes recommended that the father receive treatment for his behaviors so that he would be "less likely to offend the people he was trying to work with. Less likely to hurt the feelings of his daughter. And, less likely to get into trouble with his impulsive, aggressive behavior."
Dr. Hopes believes the father "certainly could learn" from a parenting education course "what are the age appropriate expectations of his daughter," such as wanting to be a little more independent. "But, at the same time learning that it's not all what she wants, because there have to be rules in place."
Dr. Hopes explained the difference between paranoid and narcissistic personality disorders. She stated that an individual with PPD "is genuinely afraid of other people," "thinks other people are trying to hurt them, and they need to protect themselves and what's theirs." An individual with narcissistic personality disorder (NPD) displays "fear that they will be exposed for not being as wonderful and special and unique as they try to convince others that they are." She did not, however, diagnose the father with NPD.
Even though Dr. Hopes did not diagnose the father with NPD, she explained that a child of a parent with NPD "would feel, could feel rejected; could feel unloved; could feel frightened at the outbursts, if they were physical; and it would make a child feel insecure, not being able to predict how this person with this disorder might behave from one moment to the next."
Dr. Hopes also evaluated the paternal grandmother. The grandmother reported that the father "had been in trouble with the law; he had trouble drinking; and * * * he had been aggressive toward them." The grandmother stated that the father had been violent with them in the past and had "even gone to jail once because of it." Dr. Hopes believes the court gave temporary custody to appellee in 2014, "because the Judge was afraid that if [the child] were allowed to stay with the grandparents, [the father] would have hurt them."
During Dr. Hopes' evaluation of the grandmother, the grandmother stated that she helped care for the child and revealed that the child "would sometimes call them when her father and mother were physically fighting, and asked the grandparents to come and get her."
Dr. Hopes administered the MMPI to the grandmother. Her tests results were "very defensive, which means she was trying hard to look good, and was doing it to such an extreme that she was denying minor problems that are common to most people. As a result of that, her test results were not considered valid." But Dr. Hopes does not believe the grandmother suffers from a mental illness of personality disorder.
Dr. Hopes explained that the grandmother expressed her religious beliefs that "to most people would seem odd, if not delusional." Dr. Hopes indicated that the grandmother discussed her belief that the child had died and came back to life with the power to heal others simply by touching them. Dr. Hopes emphasized that these are part of the grandmother's religious beliefs and do not indicate a mental illness.
*413 Dr. Hopes also evaluated the grandfather and diagnosed him with PPD and "age related cognitive decline." She did not have any treatment recommendations for the grandfather "[b]ecause he was just so adamantly against any kind of intervention. He insisted that he was perfect, that he was leading God's word, and there was nothing he wanted to change about himself."
3
Timothy Brady
Timothy Brady, a licensed independent social worker, testified that the father was a former client at Scioto Paint Valley Mental Health (SPVMH). A January 2015 evaluation indicated an adjustment disorder, which "means that a person has a normal reaction to the normal stress of life." The father's treatment plan included psychiatric supportive services to help him deal with children services.
Brady later changed the father's diagnosis to NPD. After the changed diagnosis, he met with the father weekly, from April 2015 to July 2015. Brady believed that the father successfully completed treatment and thus terminated the treatment program. Brady believed that the treatment was successful because "the traits that brought him in were ameliorated and his dysfunction was not as bad." Brady did not have concerns of physical abuse or anger issues.
Brady did not feel that family counseling was necessary at the time. Brady believes, however, that if family counseling were indicated, it "would be ideal" to have an independent person perform the counseling-someone without a past history with the parties.
4
Dr. Rame Shivani
Dr. Shivani is a psychiatrist who started treating the father in February 2016 and saw him four or five times. Dr. Shivani diagnosed the father with adjustment disorder with mixed emotions/stress and a sleep disorder. Dr. Shivani did not diagnose the father with NPD. Dr. Shivani recommended psychotherapy to deal with coping skills, medication, and mental health counseling.
5
Nikki Priest
Priest is a substance abuse specialist and outpatient therapist specialist at SPVMH. In May 30, 2017, she started seeing the father "to receive individual counseling for some stress related experiences that he was having." She diagnosed the father with adjustment disorder with depressive and anxious symptoms. Priest did not agree with Brady's NPD diagnosis.
On cross-examination, Priest revealed that she obtained her Master's Degree in May 2017, and started working at SPVMH on May 15, 2017. Priest indicated that she did not perform a comprehensive psychological evaluation of the father and that she is not qualified to do psychological evaluations. Priest related that the father reported to her that he did not agree with the NPD diagnosis and "would like to do individual counseling to be 'vindicated' of this diagnosis."
D
VISITS
1
Indigo Johnson
Between June 2014 and June 2015, Johnson supervised eighteen visits between *414 the father and the child (and Tammy) and supervised five visits between the child and the grandparents. During the August 5, 2014 visit, the father and Tammy made derogatory comments about the foster parents and asked where the child would be attending school. The child "continually stated she didn't know where she was going to be going to school yet" and she "tried to redirect the conversation a number of times * * * down to talking about the number of pickles on her burger." The child shared during this visit that she had gone to museums with the foster parents in Cincinnati. The father had negative responses-he said "things to the effect that they're taking daddy and daughter time away from us, aren't they? And what does a family look like? A mom and dad and a child, not all these other people." The father stated that "he wished that they were having fun together" and asked the child, "Don't you wish I was there with you?" After this conversation, the father appeared to distance himself-"he was crossing his arms, sitting back of the table throughout the visit." After the visit, "[t]here were multiple rule violations given out after that visit for case related discussion, in regards to schooling, uh, derogatory remarks about the foster parent, * * * [i]gnoring staff directives."
At the next visit, she reviewed the rule violations with the father, and he "refused to sign" them. "He was not happy about them being issued and refused to sign them." He indicated "that he was kinda [sic] done dealing with us, and he was gonna [sic] take it to the next level." The father "stated that he was disappointed in us." He also stated that the staff "needed to be careful about going against his religious beliefs, that God was taking care of him and would punish those who were not with financial difficulties [and] illness * * *." At a later meeting, the caseworker and visitation monitors showed the father the video of the visit during which he made inappropriate comments in order to discuss how to better conduct future visits.
At the August 12, 2014 visit, the father informed the child that she should not wear jewelry that he had not given to her. He also commented on a dress that the child was wearing-it was an older dress and the father stated something "to the effect that" the dress "is a rag he wouldn't wipe his care [sic] with. Why are you being allowed to wear that?" The child cried. The child explained that it was one of her favorite articles of clothing and that her grandparents had given it to her.
On September 9, 2014, the child was wearing a wooden beaded necklace. The father expressed concern that the child had bruising on her neck from the necklace. Johnson looked at it and thought that perhaps some of the dye from the necklace had transferred to the child's skin, but she did not believe the skin appeared bruised. The child "kind of rolled her eyes" in response to the father's concern. Shortly thereafter, the father pointed out that the child had a red mark on her forearm, and the child responded, "Oh, not this again."
During a February 2015 visit, the child learned that the father had donated many of her old toys to the FAC. The child was "very upset" that her father had donated her old toys without her knowledge and that "this was kind of how she found out."
Johnson explained that before every visit, FAC staff asks whether the parent brought any gifts in order to ensure that any gifts are appropriate. Johnson stated that on May 12, 2015, the father arrived at the visit and informed the staff that he had not brought any gifts for the child. The father later gave the child a "mother-daughter" necklace. Tammy kept the mother part. The father told the child that *415 "he had gotten rid of" the child's biological mother and that he was "so glad that he had found Tammy." The father called the biological mother "bush trash."
On June 2, 2015, the foster parents had donated some flowers to plant outside the FAC. After the child's visit with her father, the child helped the foster father plant the flowers. The father unexpectedly returned to the FAC in order to pick up an item he had left behind and became upset that the child was outside planting flowers in new clothes that he had just given her. The father "made comments that she shouldn't be doing that, that it was kind of slave-work and things like that." The father was yelling at the staff and received another violation.
On cross-examination, Johnson agreed that several of the visits went well and that the parties often ended the visits with hugs and kisses. For instance, on October 7, 2014, the father and Tammy surprised the child with a birthday party at the FAC. During other visits, the father helped the child with homework, they ate meals together, they played games, and they watched movies.
2
Frances Cochran
Cochran supervised forty-one visits between the father, the child, and Tammy. Cochran stated that during a February 1, 2016, the father discussed adoption with the child. The father asked the child if "she was okay with it," and the child stated, "I'm okay with it." The father asked her why should would not "want to come back to your daddy." The father explained that she would not be able to see her grandparents anymore. The child indicated that she still was fine with being adopted. The father told the child that "she had hurt them, him and Tammy, by being okay with it." He also indicated that he and Tammy would move away and that "he didn't want to be around while she destroyed herself."
3
Delores Colville
Colville supervised fifty-one visits between the father and the child. During the June 9, 2015 visit-the visit following the flower-planting incident-the father informed the child that "she was going to be put in time-out" "for lying, and disrespecting him." The father told the child to write 500 sentences that stated, "I will not lie or disrespect my dad or Tammy anymore." The child was visibly upset-she cried, lowered her head, and had tears in her eyes. Colville asked the father several times what lie the child told, but the father did not explain. Instead, the father continued "going back to the flower incident."
Colville stated that the father was agitated at a January 2017 visit when he learned that he had not submitted a proper request to engage in a certain activity during his visit with the child. The father stated, "Melissa Wheaton will meet her maker and face the wrath of God." The father subsequently was charged with aggravated menacing.
4
Melissa Wheaton
Wheaton is the director of the FAC. The father has been visiting his child at the FAC since the grandparents obtained legal custody of the child. Since June 2014, when the child was placed in appellee's temporary custody, the father has attended 126 visits and cancelled seven visits, three of which he made up. Wheaton stated that she has had "[m]ore interaction" with the *416 father than "any other client in [her] career" at the FAC.
Throughout the course of all of the father's visits-both before and after the child entered appellee's temporary custody-Wheaton identified several "global issues." The father (1) displayed controlling, childish, self-centered, rude and paranoid behavior, (2) withheld affection, (3) threatened abandonment, (4) used his religious beliefs to control or manipulate the child, (5) guilted the child, and (6) criticized "the child almost incessantly sometimes to the point where the child would actually leave the room and tell the monitor that she didn't think she could say or do anything right." The father criticized the child's weight, her diet, her portion control, and her clothing. Wheaton also stated that the father intimidated staff and displayed difficulty prioritizing his visits with the child.
Wheaton described the overall quality of the visits as "tense," "controlled," or "oppressive." Although there were some "good visits," "in total," the father displayed "a lot of childish self-centered behavior," without "insight as to how it impacts the child." She stated that if the visits seemed to go in the father's favor, then his behavior would be more positive. But if he did not get his way, the visits tended to be negative. When he did not get his way, he would "withhold affection, pout, disengage."
Wheaton stated that the father has had twenty-four written rule violations for conduct such as forgetting to bring identification, using curse words, leaving the room without permission, arriving too early, making derogatory remarks about other family members or care providers, inappropriate questioning of the child, and being disrespectful to staff. Wheaton explained that the rule violations are issued to help "correct the behavior, or to improve the visit situation." The rules are in place to help parents "have a positive bonding experience." She has personally met with the father on occasion to discuss his rule violations. "There are way more instances of rules being violated than there are written violations in his file. Some of his visits have been so full of issues that he would have been overwhelmed with the number of violations given him." She tried "to coach him about the most important things for him to correct, or to bring those things to his awareness." However, "it usually doesn't go very well when we try to address rule violations with [the father]. Often times he's very upset, you know, it's been said that we ruined his visit; he becomes very negative about the situation."
On April 3, 2015, the father called Wheaton and indicated that he would like to obtain statements from visitation staff "that he was all about his child and his visits, and not about himself" in order to dispute his recent diagnosis of NPD. Wheaton advised the father that she would not be able to provide those statements, and neither could any other visitation staff. But she told him that if she or other staff were subpoenaed to testify, they could provide information regarding their observations. Wheaton stated that this phone conversation went on for about one hour. At one point she told the father "that it didn't really make a difference as to which diagnosis he actually ended up with, that the treatment was the same." Wheaton "encouraged him to engage in services, the counseling services, because that was ultimately what was going to get him closer to having his child back in his home."
During the June 9, 2015 visit, "nearly the entire visit was spent punishing * * * the child. It was about an hour and 40 minutes of that visit where the child was almost completely disengaged, had no idea why she was in trouble; withdrawn and *417 showed just all kinds of stress and discouragement in that visit."
During a November 24, 2015 visit, the father told the child "that would probably be his last visit and he wouldn't be coming back." He then did not in fact return for the next couple of visits. When he did return, "there was no greeting or contact with the child or engaging with the child for the first 20 minutes of the visit."
The father canceled a visit on December 1, 2015 and did not provide a reason. However, the week prior, the visits did not go well-"there were some problems with things that he confronted the child about * * * and it was just very uncomfortable. The child actually asked a staff member to sit in the room for the remainder of the visit."
A February 1, 2016 visit involved an adoption conversation between the child and the father. The child indicated that she wanted to be adopted. During this visit, the father also stated that he and Tammy were going to move far away and that this might be their last visit. Wheaton believed that the father attempted to provoke an emotional reaction from the child, but the child "was fine."
On November 23, 2016, Wheaton had a conversation with the father, and at the end of the discussion, the father informed her that he would like to meet with her before "each of his visits because he felt like it had helped him so much, and that he'd like to meet with [her] before each visit just for the encouragement." She explained that she shared ideas for improving his visits with the child so as to prevent "shutting her down during visits, because it had been a theme." She stated that "the child would offer things to him that she knew, or that she had learned, sharing scriptures and things like that, and that he was inclined to often add on or correct what she was telling him rather than listening and appreciating and praising her for the things that she was sharing or offering up."
Wheaton also attempted to help improve the visits by asking the father to view videotapes of his visits with the child. She, the caseworker, and the guardian ad litem watched the videos with the father and pinpointed some of the concerning behaviors and explained why the behaviors posed a problem and "encouraged him in different ways that he might be able to handle those situations."
Wheaton also has written "special rules" for the father. She believes "it is [her] job" and her "desire to try to do everything [she] can to support reunification with a parent." Wheaton stated that she does not typically spend quite so much time with a single parent. She stated that she "spent countless hours reviewing videos [and] dealing with staff difficulties," in addition to meetings and phone calls with the father.
Wheaton explained that the grandparents' visits with the child had been reinstated at the end of November 2016 and that she had heard reports of volatility between the father and the grandparents. In an attempt to prevent problems from arising, she scheduled the grandparents' visits before the father's visits so that she would be available to monitor the transition and ensure that the father and Tammy could enter the center safely and that the grandparents could exit without there being any contact between the parties.
However, after the grandparents' visits resumed, the father cancelled his visits scheduled for November 28, 2016, December 2 and 9, 2016, and did not make up those visits. On November 28, the father stated that he canceled for personal reasons *418 and that the staff could contact his attorney if they had any questions. On December 2, the father stated that his parents made threatening phone calls and left threatening messages "and that nobody would be able to keep him and Tammy safe."
On December 8, 2016, Wheaton spoke to the father for approximately one hour and explained her plan "for keeping things safe and making sure he could have a good, quality visit." The father stated that he would not visit because "he didn't feel that there was anything that we could do to keep him safe from his parents." The father stated that his father "had attacked him a couple of times recently at Wal-Mart, once even trying to run him over in the parking lot." She continued to try to talk the father into visiting, but he would not agree. She informed the father that she was "concerned that if he didn't get back into the center to exercise his visitation time at the Center that he would be passing up opportunities to see [the child] outside of the Center, with the agreement that was in place." The father indicated that "he intended to go to the hospital and get a note saying that it stresses him out too much to visit * * * with his parents there at the same time, or exchange point."
Wheaton stated that the father did not attend the November 18, 2016 visit due to "stress," and that he failed to confirm the December 16, 2016 visit.
During the January 6, 2017 visit, the child wanted to make snowflakes, but the father stated that he wanted to play a game "and that ultimately at the end of the day he needed to make himself happy because that was all that really mattered." The father left the visit early and abruptly. Tammy told the child that she loved her and gave her a hug; the father returned to the room "and kind of hugged [the child] from behind and said 'Love you.' [sic]." At the end of the visit, after the father and Tammy had left, the child "actually starts to cry and goes up to the wall in the room and is crying against the wall."
On January 12, 2017, Wheaton had a phone conversation with the father. She "wanted to pre-warn him that he would be receiving a violation for ending his visit early on the 6th to give him a little bit of time to process it before he actually came in for his visit the next day so that he wouldn't still be upset." She explained the importance of not placing the child in a situation where she feels abandoned. During this conversation, the father stated that the child "was a liar, telling lies, that she was a liar, and he needed to get to the bottom of it." Wheaton tried to delve further to find out what he meant, but the father first "cited HIPAA as a reason why he couldn't discuss it." The "phone call ended poorly" and he stated that Wheaton and her supervisor, Larry McGuire, "needed to, uh, 'get off his butt,' and he hung up."
At the beginning of the January 13, 2017 visit, Wheaton informed the father that she would like to speak to him separately from the child. She informed him that he had not filled out a request form at the end of his January 6 visit, so "he wasn't able to bring anything in or exercise any of those requests." She explained that the rules require 48 hours advance notice if the parent wishes "to go outside or to the rec room or use the living room, or bring a meal in, or gifts, or a camera." This date, the father had brought in food items. She wanted to advise the father outside of the child's presence that he would be unable to have a meal with her that day due to his failure to submit a proper request. "[T]he entire situation just went downhill when he began tearing into the worker for how she *419 had handled the visit on the 6th and actually the verbal attacks were also directed towards me." The father attacked her "personality" and told her that she "needed to be in control of everything." The father later told the staff member that he was not "feeling well and that he needed to go to the ER[,] that he was having chest pains."
On January 20, 2017, the father gave Wheaton two notes-one for him and one for Tammy. Both were dated January 18, 2017. Tammy's note stated: "It is in patient's best interest to avoid any stressful situations due to exacerbation of patient's medical conditions." The father's note stated: "It is in patient's best interest to avoid any stressful situations due to patient's on-going medical conditions." Wheaton informed the father that despite the doctor's notes, the father "would still be expected to follow the rules." She told him that they would address the rule violations from the prior visits after he visited with the child. "And he basically said that I could write 'refused' on those write-ups, that his doctor's note covers it. And he told me I was stressing him out. And said 'Depart from me you worker of iniquity.' And was waving at me basically telling me to leave the room." She became concerned that they "weren't likely to have a positive visit," and if she "couldn't manage the situation," then she was not "comfortable leaving staff to manage the situation." She thus asked the father to accompany her "to be signed out."
Wheaton stated that criminal charges subsequently were filed against the father, but she did not elaborate on the exact conduct that led to criminal charges. Additionally, on February 8, 2017, the court issued a no contact order between Wheaton, HCCS, and Delores Colville. On April 27, 2017, the court modified the entry to allow contact between the father and Larry McGuire.
Wheaton is concerned for the child's "emotional welfare." She explained that sometimes, the father would ask the child if she had seen him at a local store but pretended that she had not, turned around, and left. The child indicated that she had not seen him. The father then asked the child if she were to see him at a local store, if he could say hello to her. The child stated, "Well, I guess so." The father proceeded to engage in a lecture about his religious belief that everyone needs to "stand in judgment and give account someday, and that the Lord's going to open up his Book of Life, and those that had lied or said that they didn't see people, or turn around and go the other way, that the Lord would say to them 'Depart from me you worker of iniquity.' And basically send them to eternal damnation." Wheaton found that "it was pretty clear that the message being sent was if you're lying to me about * * * seeing me, or you turned and walked the other way, that he was applying pressure, but with his religious beliefs, terrorizing her."
Wheaton has "an abundance of negative concerns" that, when combined with "the amount of effort that has been put into the case in trying to correct these issues," causes even more concerns. She believes that appellee has "tried everything we know how to do to correct the situation and encourage positive bonding experiences, and it's just not happening consistently." She agreed that the father and child shared some good visits, but there have not been "consistently good visits where he is demonstrating the ability to parent her in a healthy way," to "[e]ngage her in age appropriate conversation and activities," to refrain "from guilting her or doing anything that is emotionally unhealthy or abusive." She has not seen consistent *420 improvement, despite all of the efforts. Instead, "if anything," she believes "it has gotten more challenging and more negative."
Wheaton feels that she has "gone above and beyond trying to remedy the problems" associated with the family. She has conducted "lots of meetings and phone calls to try and discuss" the problems. She has offered suggestions for engaging the child and avoiding difficult topics. She does not "know that there's anything that I could've done that" she has not. Wheaton stated that unfortunately, "[t]he visits have continued to be problematic, and as a matter of fact, the behaviors have escalated and become more frequent." Wheaton did not notice any improvements after the father and the child started counseling, but instead, "[t]hey actually became more riddled with problems."
Wheaton stated that the mother did not start visiting the child until the child had been in custody for approximately one year. Since June 2014, the mother has attended twenty-seven visits. When the mother did visit, they had "very positive" interactions, and the child appeared comfortable visiting with her mother.
E
CASEWORKER
Larry McGuire
HCCS case management supervisor McGuire explained that the father and the child did not engage in family counseling sessions at an earlier date based upon the child's counselor's recommendation.
On November 17, 2016, the father left McGuire a message regarding the family counseling sessions. The father did not believe that the sessions were going well. He felt that he was being "berated, blamed for everything that had happened in the past." The father stated that the child "was a liar, and that he didn't know if he was going to be able to continue with these sessions, he didn't know, he may be done." McGuire called the father but was only able to leave a message indicating that they have come "too far to quit" and that he needs to "stick with this and see it through." The father left a message in return "thanking" McGuire "for encouraging him" and indicating that he would continue the family counseling.
McGuire does not believe that the family counseling sessions were successful and believes that they actually were detrimental to the child. McGuire explained that he attempted to discuss the family counseling and visitation concerns with the father, but the meeting "was cut short" due to the father's arrest involving the Wheaton statement.
In February 2017, the father stopped in the office to visit with McGuire and stated that he did not feel that the FAC and Wheaton had been treating him fairly and "that he was being blamed for everything."
McGuire agreed that the father has completed the case plan activities but stated that his cooperation has "been a struggle." Several times the father asked McGuire "to have all contact go through his attorney and not to stop by his home, and not to call him. That's a challenge." McGuire further explained that although the father may have complied with the services recommended in the case plan, the father did not change his behavior. McGuire stated: "[T]he therapy isn't successful if it creates more difficulties and more challenges, and the parenting skills go down as a result."
McGuire related that appellee requested permanent custody of the child because the father "has struggled with family counseling; has struggled with visitation; and *421 has not demonstrated the ability to provide appropriate care for her consistently." McGuire's "main concern" with the father "is his ability to handle and deal with all the issues that are going to come up with her. She's got some concerns, and some behaviors, and I don't think he's going to be able to handle the situations that may arise with her."
McGuire indicated that the parties had some confusion regarding the terms of the father's supervised visitation outside of the FAC, and that apparently is why the outside visits did not occur. McGuire explained that he thought the order required the father to attend his regularly-scheduled supervised visits at the FAC in order to be entitled to supervised visits outside of the FAC. McGuire stated that when the father failed to show for the visits in November and December 2016, McGuire thought that negated the outside visits.
McGuire stated that after one of the December 2016 visits that the father had attended, McGuire called the father to arrange a supervised, off-site visit, but he was unable to connect with the father. By the time the father returned McGuire's phone call, the father had missed his next FAC visit.
McGuire did not believe that the child needed to undergo further psychological testing as a result of her suicidal ideations. He pointed out that she has remained in counseling throughout the proceedings. Additionally, the child was referred for a crisis intervention evaluation and received it.
The father's counsel McGuire asked about alleged twenty-seven school absences, but McGuire stated that he was unaware of twenty-seven absences. He later explained that "many" absences were for counseling and were "only partial days."
F
FOSTER PARENTS
1
Foster Mother
When the child first entered the foster home, the child "was really quiet. She always walked around with her head hung down, always looked down, wouldn't make eye contact when you spoke with her. She appeared to be scared a lot of times." This behavior last for approximately three to four months.
The foster mother explained that over the course of the last three years, the child's demeanor before and after visits started as "scared," as if she did not want to go, but then "after a while she seemed to enjoy it. And then it got to where she would come home and she would be very upset, be frustrated." The child's demeanor was positive for three or four months out of the entire three-year time frame. Other than that, she ordinarily was "not good" with respect to visits, but the child occasionally had a good visit. The child "appeared to always look forward to the visits with her mom."
The foster mother stated that the foster family seemingly "constantly" ran into the father at Wal-Mart. The foster mother explained the child's reaction upon seeing her father: "She gets right up against the closest person to her, and you can actually feel her up against your back literally." One time, the child "broke down in tears" and they had to leave the store.
The foster mother indicated that the father and Tammy appeared at her church on a weeknight when the church holds an addiction recovery program. The child became "very anxious and upset." She went *422 into the office with the child and "tried to get her mind off things."
The foster mother stated that her relationship with the child is "like any typical mother/daughter relationship." The child interacts well with the other children in her home and has "bloomed" while in her home. Her grades have improved and her demeanor has improved: "She now walks with her head up. She'll look you in the eye. She can engage in full conversations. She smiles a lot. She laughs a lot. She's just really bloomed." The foster mother would be interested in adopting the child. "She's a part of our family."
The foster mother explained that in early 2017, the child made some statements regarding suicide. When the foster mother asked the child about it, the child stated "that she would commit suicide if she was sent home with her dad or grandparents." The foster mother contacted the child's counselor, they met with the counselor, and they took the child to the pediatrician. The pediatrician prescribed medication.
The foster mother described another concerning incident that occurred in March 2017. The child stated "that if she went home that she was going to take a phone, a tablet, and a gun, and she was gonna kill herself or her dad. And she said that it would make the news because when she killed him that she would tell them it was because they placed her back with him." The foster mother "was very concerned. Because the way [the child] said it, it was like she had more of a plan." The foster mother indicated that the child seems to have these suicidal thoughts "right before court hearings."
The foster mother again contacted the child's counselor and pediatrician. Dr. Blackwell recently referred the child for a psychiatric evaluation due to the child's expressions of self-harm. The child's evaluation occurred on June 13, 2016, and further treatment was not recommended, unless the child's condition worsened.
2
The Foster Father
The foster father stated that if the child saw her father at a local store, she did not want to approach him. Instead, "every time she would see her dad, she would always put her head down and get behind us." He stated that the child "was afraid." One time, the father and Tammy showed up at their church. The child "was scared," "shaking," and "just extremely nervous."
The child has "opened up a lot more" since being placed in his home. She is "able to voice her opinions. She gets along well with the kids." The foster father is willing to adopt the child.
G
THE PARENTS
1
The Mother
When the child was born, the mother and the father lived together but were unmarried. She and the father separated when the child was around eight years old-around the same time that Tammy moved in with them.
She and the father had a "[p]retty rocky" relationship. On the night of her thirty-first birthday, the father "kept beating her and calling her names." He threw his cell phone at her and it hit the top of her foot. The father told her that she "deserved to be raped" and that she "was a no good whore." After he left the room, she called the paternal grandmother to retrieve her and the child. The mother stated that this was not the only occasion *423 when the father was violent with her. Instead, "[t]here were multiple times while we were married."
Another time, the father told the mother that she "was a no good mom" and that she "would try to molest [the child] since [the mother] was molested from birth until [she] was thirteen."
The mother described witnessing the father physically abuse the child. When the child was six months old, the child "kept squirming, and [the father] threw [the child] down a couple times." When the child was around four or five, the father dropped the child on an air mattress, and the mother saw the child's head jerk, "like it took her breath." The father left for a little while, and then returned in an attempt to play around with the child. However, the child "smacked her father in the face and he * * * got her by her throat and held her against the love seat." She tried to protect the child by asking the paternal grandparents to take the child until the father calmed down. Another time, the father engaged in an altercation with a friend, and the father "hit [the friend] with a pipe." The child saw the altercation.
The mother agreed that she has not completed her case plan. She stated that she has been in jail for approximately the past two and one-half months. The mother admitted that she did not visit the child for the first year that appellee had temporary custody. The mother believes that "the best thing for [her] daughter is to be placed with [the foster parents]." However, she would prefer that the court placed the child with the grandparents. When asked if she thought the child would be safe if placed with her father, the mother responded, "[p]robably not."
2
The Father
The father lived with the child and the mother until September 2010, when the child was removed from the home. He denied that he was physically violent with the child or the mother.
Except for some missed visits here and there, the father consistently visited the child. He missed a few visits in November/December 2016 because he "just forgot." He also missed some visits in November/December 2016, because his visits were scheduled the same day as his parents. He did not believe that the child should be "getting shuffled." The father additionally thought that he and the grandparents each had a "right to their own day." The father explained that he missed three consecutive visits in November/December 2016 because he "was trying to work things to get a date switched."
On cross-examination, the father denied that he made a choice not to attend visits in November/December 2016, but instead, claimed that he "was waiting for a phone call back for confirmation on redirection from Melissa Wheaton." He later stated that he missed the visits because he was waiting for Wheaton to confirm "what we could do to rectify the situation." The father stated that he did not visit because according to the FAC rules, his visits were not supposed to conflict, "so [he] was going according to their rules." The court interjected, "But they would have let you visit that day," and the father stated that he did not "know nothin' [sic] about it until it was too late for me," and he needed time to "figure it out." He explained that "it was just throwed [sic] in my face all at once. Nobody called and told me what was goin' [sic] on. I was clueless." The court asked him whether the visit could have happened if he had chosen to exercise it, and he *424 stated that the visit did not occur because he did not "have a confirmation back with what was goin' on. I was explained one thing from Melissa Wheaton, and then another thing happened which contradicted what she said. I was confused." The father denied that he told Wheaton and Colville that he was not visiting because he feared for his life due to his parents visiting immediately before his visit. The father stated he "was afraid of what Melissa would do."
The father agreed that he missed visits on November 11, 28, December 2, 9, and 16 "due to circumstances." The father stated that he canceled the November 18 visit because he saw a doctor. He is uncertain whether he canceled the November 28 visit and the December 2 visit.
On January 13, 2017, Wheaton informed the father that he had not completed the proper paperwork in order to have a meal during the visit. The father claimed that Wheaton "was badgering [him] and [he] was defendin' [sic] [him]self." He was upset and "in disarray as to why" this happened. He "tried as hard as [he] could to stick with the visit. But it come [sic] to a point that [he] needed to leave." The conversation with Wheaton upset him, "because she just wouldn't quit!" As he went to leave, he was in the hallway with Delores Colville. He stated that he was having a conversation during which he "made the comment about the wrath of God, that we're all gonna meet the wrath of God." He stated he was not referring to anyone in particular. Afterwards, he went to the emergency room for stress.
The father explained that he was "shocked, stunned, and highly upset" when he realized the foster father had arrived to the FAC in order to plant flowers during his visitation time. He thought the foster father's presence would distract from the movie, "which it did." He stated that the child "got up several different times" to look out the window. After he and Tammy left the FAC, they realized Tammy forgot a bowl, so they returned to the FAC. The father and Tammy were upset that the child was planting flowers in the Easter dress that he and Tammy had just purchased for her.
The father stated that he disciplined the child during a visit for "lying to [him]. The father indicated that the child lied about cutting her hair, lied about seeing him at Wal-Mart, and lied about whether she saw her grandparents when out and about with the foster family.
The father explained how he would react if the child asked him whether she could cut her hair or pierce her ears. The father stated that he would sit down with her and talk through it. He would discuss it with her to find of if she is "a leader, or if [she is] following the crowd." The father indicated that he "would talk to her, and we would study the bible and then whatever decision come [sic] out through prayer and supplication, then we would let God be God and that answer would stand." He stated that he would allow the child to cut her hair "[i]f God leads her in that direction."
If the child made statements of self-harm while in his care, he would seek immediate help. The court asked the father, bluntly, whether he was "concerned that if she goes back with you that you're going to have a dead daughter and nobody is going to raise her?" The father responded: "Not at all. Because she never exhibited that behavior when she was with me. And she was the total opposite of what she is being labeled out to be now." The court pointed out that the child used her own words to express her thoughts of suicide, but the father stated "Who's to say that it ain't [sic] being put in her head."
*425 The father believes that appellee, the FAC, and the foster parents decided that the child would be better off with the foster parents and thus engaged in a pattern of conduct designed to deprive the father of his visitation time with the child. The father asserts that appellee failed to hold team meetings, failed to keep him informed, and imposed strict rules upon his visits (more so than upon other parents).
The father denied McGuire's assertion that the father informed McGuire that all contact needed to go through the father's attorney. Instead, the father claimed that he advised McGuire that if McGuire could not reach the father, then McGuire could contact the father's attorney; but McGuire should try to contact the father first.
The father additionally denied that he engaged in any stalking behavior. He disputed the foster mother's insinuation that the father intentionally frequented Wal-Mart during the times that the father knew the foster family would also be shopping at the store. The father asserted that he only saw the child with the foster family at Wal-Mart maybe six times a year.
The father explained that he went to the foster family's church upon the invitation of the pastor's wife. The father stated that he does not know whether he expected the child to be there-he related that he could not answer that question.
The father is concerned that the foster parents are influencing the child so that she does not want to want to live with him. He agreed that his daughter discussed adoption but would not agree that she indicated that she wanted to be adopted. The father thought the child "had been mind manipulated."
3
Tammy
The court questioned Tammy whether the child's statements that the child will commit suicide if the court placed the child with her father or grandparents concerned her, and Tammy stated, "No. Because I know how much she loves her dad and her grandparents, and I don't believe that she would do that."
III
PERMANENT CUSTODY DECISION
On August 1, 2017, the trial court entered a thirty-three-page decision that granted appellee permanent custody of the child. The court found that the child has been in appellee's temporary custody for more than twelve out of the past twenty-two months, in accordance with R.C. 2151.414(B)(1)(d), and that placing the child in appellee's permanent custody is in the child's best interest.
The court considered all of the R.C. 2151.414(D) best interest factors. With respect to the child's interactions and interrelationships, the court found that the mother's "efforts to establish a relationship with her child have been plagued by several factors caused solely by the mother herself. Examples include, drug abuse, incarceration, failure to regularly visit and a severe deficiency to comply with the case plan, such as failing to get a psychological exam, have stable housing and stable income."
The court found that the father "is controlling, demanding and unwilling to compromise or to recognize the wishes of his child. The father wants to mold the child instead of letting the child develop as a normal child." The court described the father's visits with the child throughout the case as displaying a pattern of "superficial * * * congeniality." "[H]owever, often *426 times when the father attempted to interact with the child on an interpersonal level, the father's narcissism would exhibit [it]self and the child would withdraw." "The father refused to accept the fact that the child could enjoy activities with the foster caregivers and would in fact resent her enjoyment instead of being happy that his daughter was happy. He has consistently made derogatory remarks about the foster caregivers." "The father was demeaning to the child[,] telling her that her skirt was a rag and she shouldn't wash a car with it." "He has called the child a liar, manipulative and conniving." "In late 2016, the father became so frustrated that he threatened to terminate visits early and then missed five visits. * * * [He] blames the agency or someone else."
The court agreed that some of the visits were enjoyable-they watched movies, played games, and shared hugs and kisses. "However[,] virtually every time the father engaged the daughter in interpersonal matters, his narcissistic tendencies would come out and exhibit itself in demeaning comments, jealousy of the foster caregivers and ultimately result in the child withdrawing and not communicating in an interpersonal manner."
The court ultimately found that "the Father's relationship with his child was superficial only.
The court found that the child and the foster mother share "a typical mother-daughter relationship. They play games, talk to each other and go places together." The child also shares "a typical child-sibling relationship" with the foster mother's children. The foster father also has a good relationship with the child. The child has improved socially and academically, and the foster mother indicated that she has "bloom[ed]." The foster parents plan to adopt the child, if permanent custody granted to the agency.
The court considered the child's wishes and observed that it interviewed the child on two occasions. The court pointed out that the child "understands that due to mother's personal issues, custody to the mother is really not an option. She clearly indicated that she did not want to live with her father." She misses her grandparents, "but only wanted to see them once a week." The child "enjoys her foster caregivers and likes the family relationship." "She clearly indicated that she wants to be adopted by her foster caregivers."
The court's second interview involved the child's possible suicidal ideation. The court found that this issue appears to have subsided but found the issue best resolved by professionals. The child "indicated she had issues with family counseling with her father" and "remained resolute in her request for adoption by the foster caregivers."
The guardian ad litem believes permanent custody is in the child's best interest.
The court next reviewed the child's custodial history and found as follows. The child has been in appellee's custody since June 4, 2014. The father never had legal custody and has not lived with the child for approximately six years. The child was in the mother's legal custody until the paternal grandparents gained custody in April 2011. The father lived in the home during part of the time with the mother and child.
The court also considered the child's need for a legally secure permanent placement and whether she could achieve that type of placement without granting appellee permanent custody. The court found that the mother cannot provide the child with a legally secure permanent placement. The mother has had continuous problems with homelessness, drug addiction, *427 and a history of having her children permanently removed from her home. The mother has not complied with the case plan. The mother was incarcerated during all of the permanent custody hearings, except one, and she did not attend that one. The mother understands that she cannot have custody.
The court determined that the father cannot provide the child with a legally secure permanent placement because he cannot provide for the child's emotional and mental stability. The court found that the father-child relationship "is strained to the point of withdrawal symptoms by the child." The child "has threatened to run away if custody is granted to her father or to the paternal grandparents." "The child has actually threatened suicide if she is placed with her father." The court additionally observed that "[i]f the father is controlling, demeaning, demanding and insulting to the child with clinicians, social workers and others, the Court is extremely concerned about what would occur without the supervision."
The court did not doubt "that the father loves his daughter. But, this love is much like the way one would love his car, his garden or any of his other possessions." "The Agency made effort after effort to provide services, but the father felt that he was expert as to what his daughter needed. Obviously, he is wrong or his child wouldn't be threatening suicide if she had to live with him." The father refused "to accept his deficiencies as a parent and modify his behavior accordingly so as to create an environment where return of the child to him would be in the child's best interest."
The court further found that the paternal grandparents cannot provide the child with a legally secure permanent placement. "[T]he paternal grandparents do not have the physical resources to care for the child. They live in a fifth wheel camper without adequate utilities." They have claimed that "they have a house that they may own at some time in the future. The condition has existed since at least June 4, 2014 and after 3 years, title and/or possession of the home is purely speculative." "Furthermore, the paternal grandparents at this time have abandoned their request that the child be returned to them."
The court determined that "[t]he foster caregivers * * * are the only persons able to provide a legally secure permanent placement for the child."
The court also found that R.C. 2151.414(E)(9), (10), (11), and (13) applied to the mother and that "the father has inflicted mental abuse under R.C. 2151.414(E)(15) and R.C. 2151.031."
The court considered the father's motion to strike the GAL's testimony and report. The court noted some deficiencies but not so many that the GAL fell far below the minimum standards. The court also noted that even if it struck the GAL's report and testimony, sufficient other evidence supports its findings.
The court also discussed reunification and reasonable efforts. The court pointed out that it made numerous reasonable efforts findings dating to July 18, 2014.
The court thus granted appellee permanent custody of the child.

Mother consented to the child's placement in the grandparents' legal custody.

The trial court set forth the conditions of the father's visits in its order as follows:
Father shall be permitted to begin supervised visits outside of the Family Advocacy Center * * * once a week, for two hours, in addition to the regularly scheduled visits at the FAC. Father must confirm the additional weekly visit in accordance with regular FAC rules. Father must confirm and attend the regularly scheduled FAC visit in order to exercise the additional supervised visit for the following week.
Father and K.W. shall engage in family counseling sessions at Child Focus, and must attend an individual session prior to beginning family sessions. Father will follow any treatment recommendations that the family counselor may have, including but not limited to family sessions and individual sessions. After the initial family session, Father must attend at least 4 supervised visits outside the FAC before he will be entitled to exercise unsupervised visits (in addition to his regularly scheduled FAC visits). Father will be required to confirm and attend his FAC visit in order to be able to exercise his unsupervised visit time. Father must provide in writing at the Friday visit where he intends on exercising his unsupervised time, and must confirm his unsupervised visits in accordance with FAC rules. * * * * The length of the unsupervised visits shall be at the discretion of the Agency, taking into consideration progress during the visits, counseling sessions and K.W.'s schedule. The agency anticipates gradually increasing the length of unsupervised visits as progress is made.

We include an appendix to this opinion with a more detailed review of the testimony and evidence.

Sup.R.48(D)(13) states:
A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
(a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at least one interview with the child where none of these individuals is present;
(b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;
(c) Ascertain the wishes of the child;
(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;
(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;
(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;
(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;
(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and
(I) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

Neither the father nor the grandparents' objected to Dr. Hopes' testimony regarding the contents of the documents she reviewed.